UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**JANE STONE #1,**
**JANE STONE #2,**
**JANE STONE #3,**
**JANE STONE #4,**
**JANE STONE #5,**
**JANE STONE #6,**

                   Plaintiffs,

         - against -

**ANTHONY J. ANNUCCI**, Acting
Commissioner of the New York State
Department of Corrections and Community
Supervision;
**JASON EFFMAN**, Associate Commissioner
and PREA Coordinator of the New York
State Department of Corrections and
Community Supervision;
**SUSAN SQUIRES**, Superintendent of Albion
Correctional Facility;
**SABINA KAPLAN**, Superintendent of
Bedford Hills Correctional Facility;
**BRIAN KUBIK,** Superintendent of Lakeview
Shock Incarceration Correctional Facility;
**TANYA MITCHELL-VOYD**, Superintendent
of Taconic Correctional Facility;
**JAMES W. CASTONGUAY**, Correction
Officer at Albion Correctional Facility;
**JORDAN MIDDLEBROOKS**, Correction
Officer at Albion Correctional Facility;
**WILLIE SMITH**, Correction Officer at
Albion Correctional Facility;
**DAVID STUPNICK**, Correction Officer at
Albion Correctional Facility;
**NARESH DEOSARRAN**, Correction Officer
at Bedford Hills Correctional Facility;
**JOSE GUZMAN**, Correction Officer at
Bedford Hills Correctional Facility;

20-civ-1326 (RA)(OTW)

**SECOND AMENDED**
**COMPLAINT**

<u>Jury Trial Demanded</u>

---

**TIFFANY PAIGE**, Correction Officer at
Bedford Hills Correctional Facility;
**RASHEEN SMALLS**, Correction Officer at
Bedford Hills Correctional Facility;
**MATTHEW ANTOLINI**, Correction Officer
at Lakeview Shock Incarceration
Correctional Facility;
**JAMES BEAM**, Correction Officer at
Lakeview Shock Incarceration Correctional
Facility;
**JUAN VASQUEZ**, Correction Officer at
Lakeview Shock Incarceration Correctional
Facility;
**NANCY LOPEZ**, Correction Officer at
Taconic Correctional Facility;
**KEFFION LOVELACE**, Correction Officer
at Taconic Correctional Facility;
**PEDRO NORDE**, Correction Officer at
Taconic Correctional Facility;
**MELINDA HANZLIAN**, Investigator at New
York State Department of Corrections and
Community Supervision; and
**ALVI CASTRO**, Investigator at New York
State Department of Corrections and
Community Supervision;

                                    Defendants.

Plaintiffs **JANE STONE #1**, **JANE STONE #2**, **JANE STONE #3**, **JANE STONE #4**,

**JANE STONE #5**, and **JANE STONE #6** by and through their attorneys, the Law

Office of Zachary Margulis-Ohnuma and the Law Offices of Daniel A. McGuinness,

P.C., as and for their Complaint, hereby allege as follows:

## PRELIMINARY STATEMENT

1.     This is a civil rights action brought under 42 U.S.C. § 1983 against

officials of New York State Department of Corrections and Community Supervision

("DOCCS") who violated the rights of six female inmates by sexually abusing them

2

and acting with deliberate indifference to allow that abuse. DOCCS officials and staff knew of the imminent threat of sexual assault to **JANE STONE #1**, **JANE STONE #2**, **JANE STONE #3**, **JANE STONE #4**, **JANE STONE #5**, and **JANE STONE #6**, and deliberately failed to protect them.

2.      From 2015 to 2019, DOCCS housed approximately 2,500 female inmates, around five percent of the total inmate population, in six facilities throughout the state. These women were guarded by male officers, who routinely engaged in illegal sexual activity with individual victim inmates over long periods of time. Under the New York Penal Law, an inmate can never consent to sexual activity with an officer. *See* N.Y. Penal Law § 130.05. Nonetheless, DOCCS supervisors cultivated a culture that allowed male staff to prey on female inmates to satisfy their sexual desires. Male staff were barely supervised and left alone with women under their control for long periods of time in unmonitored areas of the prisons. They had a system of warning each other if a supervisor was approaching and created a climate of fear and intimidation against any woman who complained about sexual attention from an officer.

3.      Rather than investigate officers' sexual abuse of female inmates in good faith, DOCCS investigators blamed the victims and coerced them into making statements, threatening punishment against those who chose to remain silent and discrediting many of those who spoke up. As rapes and sexual assaults of female inmates continued with alarming frequency, the defendants covered up the assaults

by giving lip service to official policies and disciplining individual staff members only when their sexual abuse of inmates became too egregious and notorious to ignore.

4.     The multiple rapes and sexual assaults of these six Plaintiffs and others described in this Complaint could have been prevented. DOCCS officials, including both administrators and guards, knew of the danger facing female inmates. They knew that multiple confirmed rapes had occurred in their facilities. They knew individual inmates were complaining of rapes that were "unsubstantiated" because the victims were routinely and unfairly discredited based solely on their status as inmates. They knew that guards were grooming inmates for sexual contact and coercive "romantic" relationships over long periods of time. In some cases, they knew of and tolerated blatantly inappropriate relationships between officers and inmates. They knew substantiated incidents of sexual abuse were ten times higher in DOCCS's female facilities than male facilities. They knew the policies that needed to be corrected and how to fix their broken culture.

5.     The supervisory defendants named in this Complaint nonetheless chose not to act, allowing these rapes and sexual assaults to occur and continue.

6.     **JANE STONE #1**, **JANE STONE #2**, **JANE STONE #3**, **JANE STONE #4**, **JANE STONE #5**, and **JANE STONE #6** now bring suit under the Eighth Amendment to the United States Constitution, 42 U.S.C. § 1983, and New York common law to recover damages for the harm caused by their sexual abuse at the hands of New York prison officials.

## JURISDICTION AND VENUE

7.      Subject matter jurisdiction over the federal constitutional and statutory claims is proper in this Court pursuant to 28 U.S.C. § 1331. This court has jurisdiction to order nominal, compensatory and punitive damages, attorneys' fees, and injunctive and declaratory relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C. §§ 1983 and 1988.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because some of the events giving rise to the claim occurred inside the Southern District of New York.

9.      DOCCS operates three all-female facilities, which are the location of the incidents described herein: Albion Correction Facility in Albion, New York ("Albion CF"); Bedford Hills Correctional Facility in Bedford Hills, New York ("BHCF"); and Taconic Correctional Facility in Bedford Hills, New York ("Taconic").

10.     The other location of events is a mixed male and female facility, Lakeview Shock Incarceration Correctional Facility in Brocton, New York ("Lakeview").

11.     Albion CF is in the Western District of New York.

12.     BHCF is in the Southern District of New York.

13.     Lakeview is in the Western District of New York.

14.     Taconic is in the Southern District of New York.

## PARTIES

### I.    PLAINTIFFS

15.   Plaintiffs **JANE STONE #1**, **JANE STONE #2**, **JANE STONE #3**, **JANE STONE #4**, **JANE STONE #5**, and **JANE STONE #6** were, at all relevant times, female inmates under the direct control and supervision of DOCCS officials.

16.   Plaintiff **JANE STONE #1** is presently in DOCCS custody, housed at Taconic in Bedford Hills, New York. During the relevant time periods, **JANE STONE #1** was housed at Albion CF and Taconic.

17.   Plaintiff **JANE STONE #2** is presently incarcerated at Taconic. During the relevant time periods, **JANE STONE #2** was housed at Albion CF.

18.   Plaintiff **JANE STONE #3** is no longer in custody and now resides in Binghamton, New York. During the relevant time periods, **JANE STONE #3** was housed at Taconic.

19.   Plaintiff **JANE STONE #4** is no longer in custody and now resides in Massapequa, New York. During the relevant time periods, **JANE STONE #4** was housed at Lakeview and Taconic.

20.   Plaintiff **JANE STONE #5** is no longer in custody and now resides in Constantia, New York. During the relevant time periods, **JANE STONE #5** was housed at BHCF, Albion CF, and Taconic.

21.   Plaintiff **JANE STONE #6** is no longer in custody and now resides in Rochester, New York. During the relevant time periods, **JANE STONE #6** was housed at Albion CF.

## II.   DEFENDANTS

22.   Defendant **ANTHONY J. ANNUCCI** ("**COMMR ANNUCCI**") was at all relevant times the Acting Commissioner of DOCCS. **COMMR ANNUCCI** is sued herein in his individual capacity.

23.   Defendant **JASON EFFMAN** ("**COMMR EFFMAN**") was at all relevant times Associate Commissioner of and Prison Rape Elimination Act Coordinator for DOCCS. **COMMR EFFMAN** is sued herein in his individual capacity.

24.   Defendant **SUSAN SQUIRES** ("**SUPT SQUIRES**") was at all relevant times the Superintendent of Albion CF. **SUPT SQUIRES** is sued in her individual capacity.

25.   Defendant **SABINA KAPLAN** ("**SUPT KAPLAN**") was at all relevant times the Superintendent of BHCF. **SUPT KAPLAN** is sued in her individual capacity.

26.   Defendant **BRIAN KUBIK** ("**SUPT KUBIK**") was at all relevant times the Superintendent of Lakeview. **SUPT KUBIK** is sued in his individual capacity.

27.   **TANYA MITCHELL-VOYD** ("**SUPT MITCHELL-VOYD**"), was at all relevant times Superintendent at Taconic. **SUPT MITCHELL-VOYD** is sued in her individual capacity.

28.   Defendants **JAMES W. CASTONGUAY** ("**CO CASTONGUAY**"), **JORDAN MIDDLEBROOKS** ("**CO MIDDLEBROOKS**"), **WILLIE SMITH** ("**CO SMITH**"), and **DAVID STUPNICK** ("**CO STUPNICK**") were at all relevant times correction officers at Albion CF. They are sued in their individual capacities.

29.   Defendants **NARESH DEOSARRAN** ("**CO DEOSARRAN**"), **JOSE GUZMAN** ("**CO GUZMAN**"), **TIFFANY PAIGE** ("**CO PAIGE**"), and **RASHEEN**

SMALLS ("CO SMALLS") were at all relevant times correction officers at BHCF. They are sued in their individual capacities.

30.     Defendants **MATTHEW ANTOLINI** ("**CO ANTOLINI**"), **JAMES BEAM** ("**CO BEAM**"), and **JUAN VASQUEZ** ("**CO VASQUEZ**") were at all relevant times correction officers at Lakeview. They are being sued in their individual capacities.

31.     Defendants **NANCY LOPEZ** ("**CO LOPEZ**"), **KEFFION LOVELACE** ("**CO LOVELACE**"), and **PEDRO NORDE** ("**CO NORDE**") were at all relevant times correction officers at Taconic. They are sued in their individual capacities.

32.     **MELINDA HANZLIAN** ("**INV HANZLIAN**") and **ALVI CASTRO** ("**INV CASTRO**") were, at all relevant times, investigators at DOCCS's Office of Special Investigations.

## FACTUAL ALLEGATIONS

### I.    GENERAL ALLEGATIONS REGARDING THE TREATMENT OF WOMEN PRISONERS IN NEW YORK STATE

33.     DOCCS operates six prisons across New York State that house women who have been convicted of crimes.

34.     Albion CF is a medium-security, all-female prison with a total capacity of 1,100 and a population of 1,083 as of April 2017.

35.     BHCF is a high-security, all-female facility with a total capacity of 926 beds and, as of October 2018, a population of 760 women.

36.     Taconic is a medium-security, all-female facility with a total capacity of 379 and a population of 329 as of October 2018.

37.     Lakeview, sometimes referred to as "Lakeview Shock," is a special "boot camp" or "shock incarceration" program that is mixed gender. It housed 105 female inmates as of January 1, 2018. Lakeview inmates agree to go through a rigorous physical and educational training program that involves, among other things, humiliation at the hands of staff, who are known as "drill instructors." If an inmate successfully completes the program, she can benefit from a reduction in her sentence.

38.     As described in further detail below, women at these facilities are routinely guarded by men working alone, including during overnight shifts in the women's housing units.

39.     As a general matter, inmates are required to follow directions or verbal commands given by correction officers.

40.     A female inmate who does not obey a direct order by a male correction officer can be "written up" or subject to discipline, which can include solitary confinement, loss of phone privileges, loss of family visits, or loss of commissary.

41.     "Commissary" refers to a financial account that inmates are permitted to use to buy basic items in prison, such as soap, feminine hygiene products, and canned foods. Money is placed in an inmate's commissary account either by outside family or friends or through prison employment.

42.     In DOCCS facilities, inmates and guards refer to the outdoor recreation space where inmates can congregate as the "yard."

43.     Many yards in DOCCS facilities do not have surveillance cameras.

44.     In DOCCS facilities, the "Bubble" refers to a glass-enclosed or open area, usually near the entrance to a particular prison unit, where an officer in charge of the unit sits.

45.     In many cases, an officer in the Bubble can electronically control the opening and closing of cell doors.

46.     In DOCCS facilities, the "count" refers to a period of time during the day when all movement within the prison is stopped so that staff can count the number of inmates to ensure that all are accounted for. Once the count "clears," normal movement and activity in the prison can resume.

47.     "Grooming" is a term used by social scientists to refer to the process by which a person intent on engaging in illegal sexual activity, such as with a child or with an inmate, gains trust from a vulnerable victim in order to gain sexual access to the victim without the victim revealing the sexual contact to someone who might prevent it.

48.     Male correction officers intent on engaging in sexual contact with female inmates frequently groom their victims by spending time speaking to them, allowing them to break seemingly arbitrary or minor prison rules, and providing them material gifts that make them more comfortable in prison, which can range from soap to alcohol or illegal drugs. Female inmates are sometimes temporarily deceived into believing that such contact is consistent with a normal romantic relationship, when it is actually a ploy to permit prison staff to engage in illegal sexual activity.

10

49.     The Prison Rape Elimination Act ("PREA") is a 2003 federal law aimed at preventing rape and sexual abuse at prisons. Detailed regulations are in place pursuant to PREA and PREA audits are required at least once every three years. A "PREA complaint" refers to a complaint regarding sexual misconduct inside a prison.

50.     The Office of Special Investigations ("OSI") is a unit within DOCCS overseen by **COMMR ANNUCCI** and **COMMR EFFMAN** that has responsibility for, among other things, investigating allegations of sexual assault.

51.     The "PREA Hotline" is a special phone number that inmates may use to make complaints relating to sexual abuse.

## II.     THE SPECIFIC SEXUAL ASSAULTS OF PLAINTIFFS BY DOCCS CORRECTION OFFICERS

### A.     Officers WILLIE SMITH, JAMES W. CASTONGUAY, and JORDAN MIDDLEBROOKS sexually assaulted JANE STONE #6 at Albion Correctional Facility.

52.     From approximately November 2018 to September 2019, **JANE STONE #6** was housed in the "M1" dorm building at Albion CF.

53.     The M1 dorm is known as a "reception dorm."

54.     The reception dorm typically houses inmates that have been recently transferred to the facility and are awaiting a more permanent dorm assignment.

55.     **JANE STONE #6** was initially housed at the M1 dorm as a new transferee. In or about December 2018, she was assigned to be the unit's "Officer's Clerk," as well as a laundry porter.

56.     As the Officer's Clerk, **JANE STONE #6** was responsible for helping orient new inmates. She would read pre-written speeches to new inmates, direct them

toward orientation, teach them about the dress code, and answer any general questions about the facility.

57.     **JANE STONE #6** was assigned to M1 dorm for in or about November 2018 until in or about September 2019.

58.     When **JANE STONE #6** first moved into the M1 dorm, **CO SMITH** was assigned the 7:00 a.m. to 3:00 p.m. shift in her unit.

59.     During the first few weeks he was there, **CO SMITH** began to ask **JANE STONE #6** personal questions and tried to peer over her cube wall after she showered.

60.     **CO SMITH** repeatedly made inappropriate comments to **JANE STONE #6**, including, on several occasions, asking her to touch his penis. **JANE STONE #6** refused.

61.     **CO SMITH** was not afraid that he would get caught because he would get a phone call from the other units warning him that a supervisor was about to make rounds.

62.     **JANE STONE #6** overheard these phone calls several times. She heard **CO SMITH** say, "Thank you for the heads up."

63.     **JANE STONE #6** then overheard **CO SMITH** immediately pick up the phone and dial the next unit over and say that another dorm had warned him that "the white shirts are coming."

64.     **CO SMITH** would either yell loudly in the dorm or use a microphone over the PA system to warn everyone to get in place because supervisors were on the way.

65.    **JANE STONE #6** did not report **CO SMITH**'s behavior because she was afraid.

66.    **JANE STONE #6** applied to be transferred to another dorm on several occasions in this time period.

67.    **JANE STONE #6** wanted to be transferred because **CO SMITH** made sexual advances on her, and she wanted to get away from him.

68.    **JANE STONE #6**'s applications for transfers were denied.

69.    **JANE STONE #6** was told that her applications were denied because there was a "captain's hold" on her.

70.    On one occasion, **CO SMITH** asked **JANE STONE #6** if he could borrow $5,000 from her to start his own business.

71.    At the same time, **CO CASTONGUAY** began to work in the M1 dorm building during the evening shift.

72.    On or about April 4, 2019, **JANE STONE #6** met **CO CASTONGUAY** for the first time.

73.    **JANE STONE #6** also worked as a laundry porter in that timeframe. The laundry porters do the laundry for all the inmates in the unit.

74.    At Albion CF, laundry porters worked in the late evenings and overnight, typically from 10:00 p.m. until 7:00 a.m.

75.    On  April 4, 2019 from approximately 11:00 p.m. to approximately 2:30 a.m. the following day, **JANE STONE #6** was doing the evening laundry.

76.     During that laundry shift, **CO CASTONGUAY** approached **JANE STONE #6** and said, "I did not know they were going to give me such a pretty laundry porter this evening."

77.     **JANE STONE #6** did not know how to respond to **CO CASTONGUAY**'s comment.

78.     **JANE STONE #6** felt intimidated and continued doing her work.

79.     Later that evening, **JANE STONE #6** walked by **CO CASTONGUAY**'s post to deliver laundry. When she passed him, he said, "You have a great ass."

80.     At approximately 1:15 a.m., **CO CASTONGUAY** entered the laundry room where **JANE STONE #6** was working and closed the door behind him.

81.     **CO CASTONGUAY** turned off the laundry room light.

82.      **CO CASTONGUAY** then asked **JANE STONE #6** to perform oral sex on him.

83.     **JANE STONE #6**, who is a victim of domestic violence, was afraid to say no.

84.     **CO CASTONGUAY** inserted his penis into **JANE STONE #6**'s mouth.

85.     **CO CASTONGUAY** then told **JANE STONE #6** he wanted to "fuck" her.

86.     Again, **JANE STONE #6** was afraid to say no.

87.     **CO CASTONGUAY** vaginally penetrated **JANE STONE #6**.

88.     **CO CASTONGUAY** did not use a condom.

89.     After a few minutes, **CO CASTONGUAY** removed his penis and ejaculated on the laundry room floor and a nearby trashcan.

90.   **CO CASTONGUAY** then left the room.

91.   **JANE STONE #6** wiped up **CO CASTONGUAY**'s ejaculate with a towel and washed it with the rest of the laundry.

92.   **JANE STONE #6** finished the laundry and then went to bed.

93.   The next evening, April 5, 2019, at approximately 2:00 or 3:00 a.m., **CO CASTONGUAY** entered **JANE STONE #6**'s cube while she was sleeping and woke her up by kicking her bed.

94.   **CO CASTONGUAY** directed **JANE STONE #6** to masturbate for him.

95.   JANE STONE #6 was afraid to disobey CO CASTONGUAY.

96.   She complied by touching her vagina with her hand.

97.   **CO CASTONGUAY** rubbed his penis through his pants while watching **JANE STONE #6**.

98.   After about 15 minutes, **CO CASTONGUAY** left **JANE STONE #6**'s cube and returned to his post.

99.    On April 9, 2019, **CO CASTONGUAY** was assigned to work **JANE STONE #6**'s unit again.

100.   When **JANE STONE #6** was alone with **CO CASTONGUAY** in the laundry room, **CO CASTONGUAY** again asked **JANE STONE #6** to perform oral sex on him.

101.   **CO CASTONGUAY** inserted his penis into **JANE STONE #6**'s mouth.

102.   This time, **CO CASTONGUAY** ejaculated into **JANE STONE #6'**s mouth.

103.   **CO CASTONGUAY** told **JANE STONE #6**, "I cannot get caught doing this."

104.   After **CO CASTONGUAY** left the laundry room, **JANE STONE #6** spit his ejaculate into the white t-shirt she had been wearing.

105.   She then finished the laundry and returned to bed.

106.   She took the t-shirt soiled with **CO CASTONGUAY**'s semen back to her cube with her.

107.   On April 25th, 2019, **JANE STONE #6** was working her shift as the laundry porter.

108.   **CO CASTONGUAY** was assigned to her unit that night.

109.   At approximately 1:30 a.m., **CO CASTONGUAY** told **JANE STONE #6** that she could shower before finishing her shift.

110.   **JANE STONE #6** showered and then returned to the laundry room to complete her duties.

111.   **CO CASTONGUAY** then entered the laundry room, closed the door, and turned off the lights.

112.   He again directed **JANE STONE #6** to perform oral sex on him.

113.   **CO CASTONGUAY** inserted his penis into **JANE STONE #6**'s mouth.

114.   **CO CASTONGUAY** then told **JANE STONE #6** to get undressed so that he could "fuck" her.

115.   He then vaginally penetrated her with his penis.

16

116.   **CO CASTONGUAY** pulled his penis out of **JANE STONE #6**'s vagina and inserted it into her mouth.

117.   He then ejaculated into her mouth and onto the floor.

118.   **JANE STONE #6** waited for **CO CASTONGUAY** to leave the laundry room.

119.   She then spit the ejaculate onto a piece of paper.

120.   She also used a paper towel to wipe up the ejaculate that had spilled onto the floor.

121.   She took the piece of paper and the paper towel back to her cube with her.

122.   In addition to being raped by **CASTONGUAY**, **JANE STONE #6** was also sexually harassed and coerced by **CO SMITH.**

123.   **CO SMITH** often called **JANE STONE #6** up to the Bubble to speak to him.

124.   **CO SMITH** repeatedly complimented **JANE STONE #6**'s buttocks.

125.   Several times, **CO SMITH** squeezed **JANE STONE #6**'s buttocks with his hand.

126.   On May 1, 2019, six days after **JANE STONE #6** was raped by **CASTONGUAY**, **CO SMITH** told **JANE STONE #6** that he wanted to watch her have sex with another female inmate.

127.   In the afternoon, while the other inmates were at their programs, **CO SMITH** directed **JANE STONE #6** to go to her cube to have sex with another inmate while he watched.

128.   **JANE STONE #6** was nude with her vaginal region exposed to **CO SMITH** while the other inmate penetrated **JANE STONE #6** with her tongue.

129.   **CO SMITH** told the women to have sex in front of him twice that same day.

130.   One time, **CO SMITH** stood in the empty cube next to **JANE STONE #6**'s cube and watched them over the wall.

131.   The other time, he stood outside **JANE STONE #6**'s cube and peered in at the two women.

132.   **CO SMITH** later repeatedly told **JANE STONE #6** and the other inmate that he would see them on the outside the day after they were released.

133.   When new inmates arrived at the M1 dorm, **CO SMITH** would give a speech warning them that if they "messed with one officer," they were "messing with them all."

134.   **JANE STONE #6** was afraid to report **CO SMITH**'s behavior to supervising officers because she was afraid of retaliation.

135.   **JANE STONE #6** gave the t-shirt soiled with **CO CASTONGUAY**'s ejaculate to a friend during a visit.

136.   **JANE STONE #6** eventually turned over the piece of paper and paper towel with **CO CASTONGUAY**'s ejaculate to OSI.

137.   From February to September 2019, **JANE STONE #6** was also sexually assaulted by **CO MIDDLEBROOKS**.

138.   **CO MIDDLEBROOKS** is in in his 60s.

139.   He was assigned to the 3:00 p.m. to 11:00 p.m. shift in the M1 dorm.

140.   **CO MIDDLEBROOKS** was known as a lenient officer who was uninterested in supervising the inmates and would often sleep through his shift.

141.   **CO MIDDLEBROOKS** would hide liquor in his bags.

142.   He would sneak liquor into the facility in water bottles.

143.   He would drink from the liquor-filled bottles throughout his shift.

144.   He would often share the liquor with the inmates he supervised, including **JANE STONE #6**.

145.   **CO MIDDLEBROOKS** would also sneak in food for **JANE STONE #6** and a few other female inmates.

146.   The food he brought in included pizza, chicken wings, and sandwiches.

147.   **CO MIDDLEBROOKS** repeatedly made verbal sexual advances on **JANE STONE #6**.

148.   **CO MIDDLEBROOKS** told **JANE STONE #6** that she "drove [him] nuts."

149.   **CO MIDDLEBROOKS** would have personal conversations with **JANE STONE #6,** telling her about his love life.

150.   **CO MIDDLEBROOKS** would frequently swap his bid to an evening shift.

151.    Upon information and belief, **CO MIDDLEBROOKS** swapped his shift because he hoped to convince one of the inmates to have sex with him in the laundry room.

152.    From February to September 2019, on more than five occasions, **CO MIDDLEBROOKS** would follow **JANE STONE #6** to the laundry room, to her cube, or order her to meet him in the employee break room, where he would have her touch his penis over his clothes.

153.    From February to September 2019, on more than ten occasions, **CO MIDDLEBROOKS** entered **JANE STONE #6**'s cube to view her naked body and to grab her breasts and buttocks.

154.    The position of **JANE STONE #6**'s cube allowed a person in it to see if anyone was coming into the unit who might observe what was happening in the cube.

155.    Upon information and belief, **CO MIDDLEBROOKS** was not concerned that he would be caught because he believed he could see if anyone was coming into the unit who might observe the sexual conduct occurring in **JANE STONE #6**'s cube.

156.    **JANE STONE #6** did not report **CO SMITH**, **CO MIDDLEBROOKS**, or **CO CASTONGUAY** through the PREA Hotline because the hotline required that the inmate's DIN# be entered when making a report.

157.    A DIN# is an individual identity number that DOCCS assigns to each inmate upon his or her commitment to supervision.

158.    **JANE STONE #6** feared that her identity would be revealed to the officers if she reported their misconduct via the hotline.

159.   **JANE STONE #6** had observed other inmates who filed complaints against correction officers being treated more harshly after filing their complaints.

160.   In mid- to late May 2019, **JANE STONE #6** learned from another inmate that **CO CASTONGUAY** had raped another inmate, **JANE STONE #1**, who had reported it to PREA.

161.   **JANE STONE #6** learned from the inmate that **CO CASTONGUAY** had told **JANE STONE #1** that he had "raped another inmate and gotten away with it."

162.   **JANE STONE #6** was afraid that others would discover that she was **CO CASTONGUAY**'s other victim.

163.   **JANE STONE #6** overheard officers calling **JANE STONE #1** a liar.

164.   **JANE STONE #6** learned from other inmates that **JANE STONE #1** was sent to solitary confinement, known in DOCCS as the Special Housing Unit ("SHU"), as a consequence of her PREA complaint.

165.   **JANE STONE #6** overheard the correction officers saying that **JANE STONE #1** lied about being raped because they heard that the examination showed no DNA evidence.

166.   **JANE STONE #6** told **CO SMITH** that she knew **JANE STONE #1**'s claims were true because **CO CASTONGUAY** had also sexually assaulted **JANE STONE #6**.

167.   Upon information and belief, **CO SMITH** never reported that **CO CASTONGUAY** had assaulted **JANE STONE #6** or took any other action to protect her.

168.   A few days later, following an anonymous letter from another inmate, **JANE STONE #6** was interviewed by an OSI investigator.

169.   **JANE STONE #6** told the investigator the dates and times of the assaults so that he could preserve video evidence.

170.   Upon information and belief, OSI was unable to recover camera recordings corroborating the attacks because the cameras record over footage every 90 days.

171.   On May 28, 2019, **JANE STONE #6** met with OSI and her then-attorney and gave a written statement regarding **CO CASTONGUAY**'s assaults, as well as the paper towel and piece of paper she had used to clean up **CO CASTONGUAY**'s semen.

172.   **JANE STONE #6** continued to cooperate with OSI after her release from Albion CF.

173.   After she was released, **JANE STONE #6** also reported to OSI the assaults by **CO SMITH** and **CO MIDDLEBROOKS**.

174.   **JANE STONE #6** testified in the grand jury against **CO CASTONGUAY**.

175.   In or about January 2020, **CO CASTONGUAY** was indicted for raping **JANE STONE #6** and **JANE STONE #1**.

176.   In or about January 2020, OSI investigators directed **JANE STONE #6** to make a recorded call to **CO MIDDLEBROOKS** with the investigators listening.

177.   After receiving direction from the investigators on what information to elicit, **JANE STONE #6** spoke to **CO MIDDLEBROOKS** on the phone with the investigators listening.

178.   On the call between **JANE STONE #6** and **CO MIDDLEBROOKS**, **CO MIDDLEBROOKS** confirmed his identity and the fact that he was a correction officer at Albion CF while **JANE STONE #6** was an inmate.

179.   On the call between **JANE STONE #6** and **CO MIDDLEBROOKS**, **CO MIDDLEBROOKS** also confirmed that **CO MIDDLEBROOKS** had kissed **JANE STONE #6** and had other inappropriate physical contact with **JANE STONE #6** while **JANE STONE #6** was an inmate at Albion CF.

180.   On the call between **JANE STONE #6** and **CO MIDDLEBROOKS**, **CO MIDDLEBROOKS** also confirmed that **CO MIDDLEBROOKS** had given his phone number to **JANE STONE #6** while **JANE STONE #6** was an inmate at Albion CF for the purposes of having sex with **JANE STONE #6** after her release.

181.   After the call, the investigators who had listened to both sides of the call on earpieces congratulated **JANE STONE #6** and said the call was very successful.

182.   The investigators then told **JANE STONE #6** that they had set up the recording function incorrectly and they only recorded **JANE STONE #6**'s side of the conversation.

183.   The investigators asked **JANE STONE #6** to make another recorded call, but **JANE STONE #6** refused.

184.   **JANE STONE #6** was deeply emotionally disturbed by not only having to relive her sexual abuse on the call, but also by pretending to be interested in meeting up with her sexual abuser.

185.    Upon information and belief, no criminal charges have been filed against **CO MIDDLEBROOKS** in connection with his sexual assaults on **JANE STONE #6.**

186.    Upon information and belief, no referral for prosecution or investigation of **CO MIDDLEBROOKS** was made to any other law enforcement agency or prosecutor's office.

187.    Upon information and belief, no DOCCS disciplinary action has been taken against **CO MIDDLEBROOKS** for the actions described above, and he continues to work at Albion CF.

188.    Upon information and belief, no charges have been filed against **CO SMITH**.

189.    Upon information and belief, no referral for prosecution or investigation of **CO SMITH** was made to any other law enforcement agency or prosecutor's office.

190.    Upon information and belief, no DOCCS disciplinary action has been taken against **CO SMITH** for the actions described above, and he continues to work at Albion CF.

191.    As a result of the multiple rapes and sexual assaults **JANE STONE #6** suffered at the hands of **CO SMITH**, **CO CASTONGUAY**, and **CO MIDDLEBROOKS**, she suffers from night terrors, anxiety, and depression.

192.    Although she is no longer incarcerated, **JANE STONE #6** suffers from anxiety and flashbacks.

193.    **JANE STONE #6** is anxious and fearful when doing laundry in her own home as a result of her repeated sexual abuse in the Albion CF laundry room.

**B. Officer JAMES W. CASTONGUAY orally, vaginally, and anally raped JANE STONE #1 in the laundry room at Albion Correctional Facility after raping JANE STONE #6.**

194. On May 12, 2019, **JANE STONE #1** was housed in the "I1" dorm building at Albion CF.

195. The dorm consists of "cubes" or bedding units with walls that do not go all the way up to the ceiling.

196. At approximately 10:45 p.m., **JANE STONE #1** returned from Ramadan services and took a shower.

197. **CO CASTONGUAY**, whom **JANE STONE #1** had never met before, entered the shower stall and looked at **JANE STONE #1**, who was nude.

198. There was no emergency or other legitimate reason for **CO CASTONGUAY** to be in the shower area where **JANE STONE #1** was unclothed.

199. **CO CASTONGUAY** did not announce his entrance or give **JANE STONE #1** any time to cover up.

200. **CO CASTONGUAY** asked **JANE STONE #1** what she was doing.

201. **JANE STONE #1** stated that she was showering.

202. **CO CASTONGUAY** told **JANE STONE #1** that it was about to be the count and for her to hurry.

203. He then left the shower area.

204. **CO CASTONGUAY** was wearing a body camera throughout the interaction.

205. **JANE STONE #1** observed that the body camera was turned off because she saw the red light, which indicated that recording was not on.

25

206.    Upon information and belief, there were no other officers assigned to the unit at that time.

207.    No other officers were present in the unit at that time.

208.    **JANE STONE #1** left the shower and immediately reported the incident to another inmate.

209.    **JANE STONE #1** did not report the incident to prison officials because she was afraid of retaliation from staff, including other officers.

210.    Later that night, throughout the overnight shift, **CO CASTONGUAY** walked around the dorm, pausing outside of **JANE STONE #1**'s cube multiple times.

211.    At some point that night, **CO CASTONGUAY** walked into **JANE STONE #1**'s cube.

212.    Once in the cube, **CO CASTONGUAY** pulled out his penis.

213.    **CO CASTONGUAY** pushed this penis towards **JANE STONE #1**'s head instructing **JANE STONE #1** to perform oral sex on him.

214.    **CO CASTONGUAY** then put his penis in **JANE STONE #1**'s mouth.

215.    **CO CASTONGUAY** turned **JANE STONE #1** around on her bed and vaginally penetrated her from behind with his penis.

216.    **CO CASTONGUAY** told **JANE STONE #1** to get dressed and go to the laundry room.

217.    Once in the laundry room, **CO CASTONGUAY** entered the laundry room and, using force, orally, vaginally, and anally raped **JANE STONE #1**.

218.    **CO CASTONGUAY** did not use a condom.

219.   **CO CASTONGUAY** said, "You're not going to tell anyone, right?"

220.   **CO CASTONGUAY** then shoved his penis into **JANE STONE #1**'s mouth and ejaculated.

221.   Once **CO CASTONGUAY** left the laundry room, **JANE STONE #1** spit the ejaculate into a sock.

222.   **JANE STONE #1** called the PREA Hotline to report the incident at her first opportunity.

223.   No one answered the PREA Hotline until later that day, after 8:00 a.m.

224.   The watch commander, who is male, ordered **JANE STONE #1** to come to the sally port and asked her about "these accusations."

225.   **JANE STONE #1** refused to answer questions about her PREA complaint in a public setting.

226.   The watch commander took **JANE STONE #1** to a private office and again asked about the accusations.

227.   **JANE STONE #1** told him that she had **CO CASTONGUAY**'s sperm.

228.   Around 2:30 p.m., **JANE STONE #1** was transferred to a hospital for a rape kit.

229.   Before she was transferred, **JANE STONE #1** was held at the medical unit at Albion CF, where an unidentified correction officer approached her and called her a liar.

230.   **JANE STONE #1** provided the sock containing the ejaculate to investigators from OSI.

231.   When **JANE STONE #1** returned to her unit, the other inmates told her that they knew about the incident.

232.   In September 2019, **CO CASTONGUAY** was charged with criminal sexual act in the third-degree, official misconduct, and rape in the third-degree for his sexual assault on **JANE STONE #1**.

233.   Upon information and belief, **CO CASTONGUAY** had raped another female inmate, who is in fact **JANE STONE #6**, prior to his rape of **JANE STONE #1**.

234.   In or about January 2020, **CO CASTONGUAY** was indicted for raping **JANE STONE #1** and **JANE STONE #6**.

235.   As a result of the rape, **JANE STONE #1** suffers from depression and Post-Traumatic Stress Disorder ("PTSD") and has been medicated by a mental health specialist to treat those conditions.

> ### C. At Albion Correctional Facility, DAVID STUPNICK engaged in illegal sexual contact with JANE STONE #2 for almost two years, including at least four more times after DOCCS Investigators learned of the abuse.

236.   **JANE STONE #2** first met **CO STUPNICK** in or about June 2017 while she was living in the "L2" dorm at Albion CF.

237.   **CO STUPNICK** would go out of his way to speak to **JANE STONE #2**, even searching for her in the Chapel.

238.   In or about August 2017, **JANE STONE #2** was transferred to the "I1" dorm building.

239.   In that timeframe, the I1 dorm building was one of the units in which **CO STUPNICK** regularly worked.

240.   In that timeframe, **CO STUPNICK** worked the 7:00 a.m. to 3:00 p.m. shift.

241.   **CO STUPNICK** was the only officer assigned to the unit during his shift.

242.   The I1 dorm housed 60 women in bunk beds and individual cubes.

243.   After **JANE STONE #2** was moved to I1 in August 2017, **CO STUPNICK** spent long periods of time during the day engaging **JANE STONE #2** in personal conversations.

244.   During **CO STUPNICK**'s shift, correction officers on other units would routinely radio ahead to warn other correction officers when supervisory rounds were about to occur.

245.   During his conversations with **JANE STONE #2**, **CO STUPNICK** did not appear worried that he would be caught speaking to **JANE STONE #2** for extended periods.

246.   In or about November 2017, **JANE STONE #2** was transferred to the "J2" dorm.

247.   **CO STUPNICK** worked in the "J1" dorm twice a week during the 3:00 p.m. to 11:00 p.m. shift.

248.   The J1 and the J2 dorms were connected by a locked door that the correction officers could access with a key.

249.   After **JANE STONE #2** was transferred, **CO STUPNICK** continued to meet with **JANE STONE #2** and spent long periods of time speaking with her at the officer's desk.

250.    In or about December 2017, **CO STUPNICK** kissed **JANE STONE #2** on the lips inside another inmate's cube in the J1 dorm.

251.    In or about January 2018, **JANE STONE #2** was transferred to the Mess Hall Dorm.

252.    One night shortly after **JANE STONE #2** was moved, **CO STUPNICK** swapped bids to work in her unit.

253.    **CO STUPNICK** directed **JANE STONE #2** to lay on the bed.

254.    While **JANE STONE #2** was on the bed, **CO STUPNICK** kissed her.

255.    He then slid his hand into her shorts and digitally penetrated her vagina.

256.    In or about April 2018, **JANE STONE #2** was transferred to the L1 dorm.

257.    At that time, **CO STUPNICK** began swapping his bids in order to work at the L1 dorm during the 3:00 p.m. to 11:00 p.m. shift.

258.    Every time **CO STUPNICK** swapped to L1, he would take **JANE STONE #2** to a cube and digitally penetrate her vagina.

259.    Usually, **CO STUPNICK** would use the corner cube of a different inmate.

260.    **CO STUPNICK** sent **JANE STONE #2** intimate letters that were often sexual in nature.

261.    In or about August 2018, **JANE STONE #2** was moved to the J1 dorm where **CO STUPNICK** worked.

262.    **CO STUPNICK** worked at the J1 dorm post twice a week from 3:00 p.m. to 11:00 p.m.

263.  **CO STUPNICK** engaged in illegal sexual conduct with **JANE STONE #2** in a cube or on the stairs leading up to the officer's desk every time he worked at J1 from in or about August 2018 until in or about January 2019.

264.  In or about August 2018, **JANE STONE #2**'s cube was searched while she was out in the yard.

265.  **JANE STONE #2** learned about the search from several inmates who told **JANE STONE #2** that OSI had come and searched her cube.

266.  **JANE STONE #2** was never told by prison officials why her cell was searched.

267.  **CO STUPNICK** told **JANE STONE #2** that other correction officers were advising him to give up his bid or to transfer to another facility because DOCCS staff were talking about the relationship.

268.  In or about December 2018, **CO STUPNICK** began meeting **JANE STONE #2**'s sister outside of the facility.

269.  **CO STUPNICK** gave **JANE STONE #2**'s sister approximately $100 a week to put into **JANE STONE #2**'s commissary account.

270.  **CO STUPNICK** also smuggled cigarettes, nail polish, and makeup for **JANE STONE #2** into the facility.

271.  **CO STUPNICK** bought **JANE STONE #2** a diamond heart-shaped necklace from Kay Jewelers.

272.  **CO STUPNICK** smuggled the diamond necklace into Albion CF so that he could give it to **JANE STONE #2**.

31

273.   Upon information and belief, OSI recovered the necklace.

274.   In January 2019, **JANE STONE #2** was transferred to the "I2" dorm, the honor dorm, which is another one of **CO STUPNICK**'s regular posts. He worked the same 3:00 p.m. to 11:00 p.m. shift two days a week and continued to sexually abuse her every time he worked.

275.   By February 2019, **CO STUPNICK** entered **JANE STONE #2**'s cube each night and made **JANE STONE #2** perform oral sex on him.

276.   Later that month, another inmate in I2 dorm reported the relationship.

277.   Two OSI investigators, **INV HANZLIAN** and **INV CASTRO**, called **JANE STONE #2** to the Administration building ("Admin").

278.   The investigators asked **JANE STONE #2** about her relationship with **CO STUPNICK**.

279.   The investigators told **JANE STONE #2** that she had to talk, or they could charge her with felonies for receiving contraband.

280.   **JANE STONE #2** refused to speak to the investigators.

281.   **CO STUPNICK** was not removed.

282.   **JANE STONE #2** returned to the dorm, where **CO STUPNICK** had her perform oral sex on him again, the same evening that she spoke to OSI investigators.

283.   Upon information and belief, over the next few days, **INV HANZLIAN** and **INV CASTRO** called dozens of inmates to Admin to ask about the relationship between **CO STUPNICK** and **JANE STONE #2**.

284.   Upon information and belief, **CO STUPNICK**'s abuse of **JANE STONE #2** was corroborated through those interviews.

285.   For the next two weeks, **CO STUPNICK** continued to work in the I2 dorm.

286.   **CO STUPNICK** directed **JANE STONE #2** to perform oral sex on him at least three more times.

287.   At the end of February 2019, **JANE STONE #2** met with two OSI investigators, **INV HANZLIAN** and a different OSI investigator.

288.   **INV HANZLIAN** and the other investigator asked her again about the relationship with **CO STUPNICK** and told her that she had to talk, or things "would only get worse from here."

289.   **INV HANZLIAN** and the other investigator told **JANE STONE #2** that someone had searched her cell and that they had DNA evidence.

290.   **INV HANZLIAN** and the other investigator also told her they had dozens of statements from other inmates about the relationship.

291.   **JANE STONE #2** feared that she would be punished for her own victimization.

292.   **JANE STONE #2** wrote a statement denying the relationship.

293.   Later that day, **JANE STONE #2** was moved to the A-Block dorm.

294.   Upon information and belief, **CO STUPNICK** finished work that day and then was told he could not return to Albion CF.

295.    At the beginning of March 2019, **JANE STONE #2** was transferred to Taconic.

296.    Upon information and belief, in May 2019, **CO STUPNICK** wrote a full confession of his illegal sexual contact with **JANE STONE #2** and of sexual contact with a separate inmate at Albion CF whom he had also raped.

297.    **CO STUPNICK** was criminally charged with four counts of second-degree sex abuse, two counts of third-degree criminal sex acts, and two counts of official misconduct for his illegal relationship with **JANE STONE #2** and another inmate at Albion CF.

298.    In or about July 2019, **JANE STONE #2** provided a full statement about the relationship between herself and **CO STUPNICK**.

299.    As a result of the abuse, **JANE STONE #2** has become anxious, severely depressed, has trouble sleeping, and cannot trust others.

300.    **JANE STONE #2** sought psychological or psychiatric treatment from DOCCS for the symptoms of her sexual victimization. **JANE STONE #2** was sent to a DOCCS treatment provider who falsely told her that she "looked fine."

301.    To date, **JANE STONE #2** has not received any mental health treatment.

### D. At Taconic Correctional Facility, PEDRO NORDE raped JANE STONE #3 more than twenty times and infected her with herpes.

302.    **JANE STONE #3** was transferred from BHCF to Taconic on May 10, 2018.

303.   **JANE STONE #3** was assigned to work in the morning in the caustics department – where inmates prepare cleaning supplies for use – and as a porter in "81" basement in the afternoon.

304.   The correction officers assigned to supervise the caustics department would rotate.

305.   In or about June 2018, **CO NORDE** met **JANE STONE #3** when he was assigned to supervise the caustics department. **CO NORDE** engaged in personal conversations with **JANE STONE #3**.

306.   **CO NORDE** swapped bids to work in the caustics department frequently to spend more time with **JANE STONE #3**.

307.   **JANE STONE #3** was often the only inmate working in the caustics department and was frequently left alone with **CO NORDE**.

308.   On one occasion, **CO NORDE** propositioned **JANE STONE #3** to have sex and asked her where they should go. **JANE STONE #3** told him that she did not know.

309.   During this period, **CO NORDE** gave **JANE STONE #3** special treatment, including agreeing to not write a ticket against **JANE STONE #3**'s friend and giving **JANE STONE #3** a razor blade.

310.   At Taconic, inmates receive one razor every two weeks. If an inmate loses her razor, she may be disciplined.

311.   During the summer of 2018, **JANE STONE #3** lost her razor.

312.   **CO NORDE** learned that **JANE STONE #3** had lost the razor and brought a new razor to **JANE STONE #3**.

313.   **CO NORDE** told her that she owed him for bringing her a razor.

314.   **CO NORDE** told **JANE STONE #3**, "promise daddy you aren't going to say anything."

315.   **CO NORDE** also asked **JANE STONE #3** if she shaved her pubic hair with the razor.

316.   **CO LOPEZ** told **JANE STONE #3** she heard about the razor and told **JANE STONE #3** that she would not report the incident, but that **JANE STONE #3** should keep her mouth shut.

317.   During the summer of 2018, **CO NORDE** instructed **JANE STONE #3** to pull down her pants in her cell and masturbate for him while he performed the count.

318.   In or about July 2018, inside the caustics room near the dental unit, **CO NORDE** took out his penis in front of **JANE STONE #3** and asked her to comment on it.

319.   **CO NORDE** masturbated and ejaculated in front of **JANE STONE #3**.

320.   In or about September 2018, **JANE STONE #3** no longer was assigned to the caustics department. She resumed taking classes in the morning, and in the afternoon from approximately 1:00 p.m. to 3:45 p.m. worked as a porter in 81 basement.

321.    On approximately 15 occasions, **CO NORDE** instructed her to finish her duties in the afternoon early, then come visit him in the caustics department. **CO NORDE** would sometimes then call the officer stationed in the 81 basement to tell them to send **JANE STONE #3** to the caustics department.

322.    **JANE STONE #3** would go to the caustics department where **CO NORDE** was waiting for her. Once inside the caustics department, **CO NORDE** would masturbate in front of **JANE STONE #3**.

323.    On one of these occasions, **JANE STONE #3** returned from caustics and **CO LOVELACE** commented that "it took a while" for **JANE STONE #3** to return.

324.    **CO LOVELACE** then called the caustics department in front of **JANE STONE #3**. When **CO NORDE** answered the phone, **CO LOVELACE** told **JANE STONE #3**, "Now I know why you wanted to go to caustics."

325.    Upon information and belief, **CO LOVELACE** knew that **JANE STONE #3** and **CO NORDE** were engaged in an inappropriate relationship. **CO LOVELACE** knew or should have known that this relationship presented an imminent risk to **JANE STONE #3**.

326.    **CO LOVELACE** never reported the incident to a commanding officer or took any action to stop the relationship or protect **JANE STONE #3**.

327.    Approximately two or three weeks later, **CO NORDE** shifted his bid from the caustics department to be stationed in the 81 basement.

328.    **CO NORDE** was usually the only officer assigned to 81 basement. In the 81 basement **CO NORDE** was left alone with **JANE STONE #3**.

329. **CO NORDE** took **JANE STONE #3** to the staff bathroom and orally and vaginally raped her.

330. Upon information and belief, there was a camera positioned outside the staff bathroom, but it was not monitored. Had it been monitored, **CO NORDE** would have been seen entering and leaving the staff bathroom with **JANE STONE #3** multiple times.

331. In or about November 2018, **JANE STONE #3** learned that **CO NORDE** had infected her with Herpes Virus Type 1 and Type 2.

332. **JANE STONE #3** then filed a PREA complaint against **CO NORDE**.

333. Upon information and belief, when other corrections staff learned that **JANE STONE #3** reported her relationship with **CO NORDE**, they retaliated by conducting additional pat frisks and cell searches on **JANE STONE #3**.

334. Upon information and belief, no criminal charges have been filed against **CO NORDE.**

335. Upon information and belief, no referral for prosecution or investigation of **CO NORDE** was made to any other law enforcement agency or prosecutor's office.

336. Upon information and belief, no DOCCS disciplinary action has been taken against **CO NORDE** for the actions described above, and he continues to work at Taconic.

### E.  At Lakeview, JAMES BEAM raped JANE STONE #4 during the same period that his friend MATTHEW ANTOLINI raped another female inmate.

337.  **JANE STONE #4** arrived at Lakeview in January 2017 and was assigned to the "G1" dorm, which housed approximately 60 women. The dorm was further broken up into smaller "platoons" of about 12-24 women.

338.  Lakeview structures its program to mirror a boot-camp to "shock" offenders into changing their behavior. The program is supposed to last for six months and prepares these non-violent inmates for consideration for early release.

339.  **CO VASQUEZ** was initially assigned to lead **JANE STONE #4**'s platoon.

340.  Upon information and belief, **JANE STONE #4** met **CO BEAM** in February 2017, when he served as a substitute for **CO VASQUEZ**.

341.  **CO BEAM** typically worked the night shift from approximately 3:00 p.m. to 11:00 p.m.

342.  **CO BEAM** singled out **JANE STONE #4** for attention and frequently approached her to discuss personal matters. In or about March 2017, **CO BEAM** began initiating private conversations with **JANE STONE #4**.

343.  **CO BEAM** told **JANE STONE #4** that he made sure he was the substitute officer every time **CO VASQUEZ** had a day off.

344.  While housed at G1 dorm, **JANE STONE #4** met another inmate named "Jane Sand." Jane Sand told **JANE STONE #4** that she was engaged in an improper relationship with **CO ANTOLINI**.

345.  Upon information and belief, **CO BEAM** and **CO ANTOLINI** were friends and frequently spent time together outside Lakeview.

346.   **CO BEAM** told **JANE STONE #4** that he was a "heavy drinker," that he used cocaine, and that he used methamphetamine. **CO BEAM** would often come into the facility with a heavy smell of alcohol on his breath.

347.   **CO BEAM** entered the facility on numerous occasions with bloodshot eyes or wearing sunglasses to hide them. **CO BEAM** was often unsteady on his feet and seemed off balance.

348.   Jane Sand told **JANE STONE #4** that she had been informed by **CO ANTOLINI** that he and **CO BEAM** would sniff cocaine together, sometimes before they came into work at Lakeview.

349.   In or about April 2017, **CO BEAM** began telling **JANE STONE #4** that her body was "beautiful" and "exotic." When **JANE STONE #4** wore shorts, **CO BEAM** complimented her legs and asked "what else is in between" her legs.

350.   In or about July 2017, **CO BEAM** began confiding in **JANE STONE #4** and discussing more personal details of his life with her, including his relationship problems and sex life.

351.   On one occasion, in or about July 2017, **CO VASQUEZ** overheard **CO BEAM**'s personal conversations with **JANE STONE #4**. The conversation was about **CO BEAM**'s girlfriend.

352.   When **CO BEAM** walked away, **CO VASQUEZ** commented to **JANE STONE #4** that this was an inappropriate conversation for an officer to be having with an inmate.

353.    On numerous occasions, **CO VASQUEZ** also saw **CO BEAM** order **JANE STONE #4** out of the dorm to speak with him.

354.    On one occasion, **CO BEAM** left his entire platoon standing outside **JANE STONE #4**'s dorm for an hour while he went inside to flirt with her.

355.    Upon information and belief, **CO VASQUEZ** never reported the incident to the PREA officer, a supervising officer, or anyone else.

356.    One morning in or about July 2017, while **JANE STONE #4** was cleaning the Bubble after breakfast, **CO BEAM** cornered her and tried to kiss her.

357.    **JANE STONE #4** moved out of the way to avoid the kiss.

358.    **JANE STONE #4** did not report the incident because she feared retaliation from other corrections staff and just wanted to graduate from Lakeview.

359.    **JANE STONE #4** wanted to report what **CO BEAM** was doing to her but lack of confidential reporting outlets at the facility made her afraid to report the harassment.

360.    The phones at Lakeview are locked at all times.

361.    Inmates are unable to access the phones unless they request a correction officer to unlock the phones for them.

362.    Correction officers routinely ask inmates why they are using the phones before they are willing to unlock them.

363.    Even after unlocking the phones, correction officers often stand near the phones during inmate calls in order to overhear their conversations.

364.   **JANE STONE #4** was afraid to tell the correction officers that she wanted to use the phone to complain about the rape.

365.   **JANE STONE #4** was also afraid to call a PREA officer, knowing that the correction officer guarding her telephone use would overhear any allegations she made.

366.   **CO BEAM** threatened to write **JANE STONE #4** up if she told anyone about his actions.

367.   Around the same time, Jane Sand confided in **JANE STONE #4** that **CO ANTOLINI** was making physical advances towards Jane Sand whenever she went to use the restroom at night, including grabbing her and kissing her.

368.   On multiple occasions, in or about July 2017, **CO BEAM** would wait for other inmates to be outside or otherwise occupied, and then would enter **JANE STONE #4**'s cubicle to try to kiss her.

369.   On or about July 27, 2017, **JANE STONE #4** and Jane Sand were told that they had failed the Shock program and did not qualify for a shorter sentence. **JANE STONE #4** and Jane Sand were the only two inmates in their platoon to not earn early release.

370.   **JANE STONE #4** and Jane Sand were kept at Lakeview for three weeks before their transfer to another facility. During the daytime in that period, **JANE STONE #4** and Jane Sand were kept alone in their cubes away from other inmates.

371.   In that period, **JANE STONE #4** witnessed **CO ANTOLINI** kiss Jane Sand and order her out of her cube numerous times to be alone with her.

372.    One night, **JANE STONE #4** overheard noises that sounded like sexual activity from the staff bathroom where she knew **CO ANTOLINI** was inside with Jane Sand.

373.    Jane Sand returned to her cube and immediately told **JANE STONE #4** that she had sex with **CO ANTOLINI**.

374.    In this same period of time, **CO ANTOLINI** demonstrated that he was aware of **CO BEAM**'s inappropriate advances towards **JANE STONE #4**, and **CO BEAM**'s desire to take it further.

375.    **CO ANTOLINI** told **JANE STONE #4** that she should "go along with" the sexual activity.

376.    **CO ANTOLINI** told **JANE STONE #4** that she should not "break his heart" and that she should give **CO BEAM** a chance, and made other remarks encouraging **JANE STONE #4** to pursue an inappropriate sexual relationship with **CO BEAM**.

377.    One day during the three weeks before her transfer from Lakeview, **CO BEAM** cornered **JANE STONE #4** in her cube, and forcefully grabbed her and pressed his body against hers.

378.    On this occasion, **CO BEAM** kissed **JANE STONE #4** and pressed his clothed, erect penis against her body.

379.    A few days later, **CO BEAM** brought **JANE STONE #4** and Jane Sand lotions and shampoo that were not available inside the Lakeview and allowed them to take a lengthy shower.

380.   As **JANE STONE #4** exited the bathroom wearing only her robe, **CO BEAM** ordered **JANE STONE #4** to go into the Bubble with him.

381.   **CO BEAM** directed Jane Sand to keep watch so he would not be caught with **JANE STONE #4**.

382.   Once **JANE STONE #4** entered the Bubble, **CO BEAM** kissed her and pushed her against the wall.

383.   **CO BEAM** directed **JANE STONE #4** to have sexual intercourse with him and then penetrated her vagina with his penis.

384.   After this incident, **CO BEAM** became increasingly aggressive with **JANE STONE #4** and continually attempted to kiss her.

385.   **JANE STONE #4** was later transferred to Taconic to serve the remainder of her sentence.

386.   **CO BEAM** continued to contact **JANE STONE #4** at Taconic.

387.   **CO BEAM** set up a post office box to use as a return address for his letters to **JANE STONE #4**.

388.   Upon information and belief, an employee at the post office recognized **CO BEAM** as a correction officer and reported his contact with an inmate to OSI.

389.   **JANE STONE #4** later disclosed the details of her abuse along with Jane Sand's abuse to investigators.

390.   In December 2017, **CO BEAM** was charged with third-degree rape and official misconduct for his relationship with **JANE STONE #4**.

391.   In January 2018, **CO BEAM**'s friend **CO ANTOLINI** was charged with official misconduct for his relationship with Jane Sand.

392.   In April 2019, Jane Sand died of a drug overdose shortly after her release from DOCCS custody.

### F. At Bedford Hills Correctional Facility, RASHEEN SMALLS repeatedly abused JANE STONE #5, including raping her in a utility closet.

393.   Beginning in or about 2011, **JANE STONE #5** was housed as an inmate in the 114A/B Unit at BHCF.

394.   In late 2014 and early 2015, **CO SMALLS** met **JANE STONE #5** when he began working in that unit.

395.   **CO SMALLS** was assigned to work the second shift from 3:30 p.m. to midnight during that time period.

396.   During the second shift, a second officer was assigned to the unit, but the officer typically remained in the Mess Hall or in the yard. Once the yard closed for the night, the second officer joined the first officer for cell searches and lockup.

397.   Over the first several months after they met, **CO SMALLS** and **JANE STONE #5** had conversations regarding their personal lives.

398.   **CO SMALLS** began sliding personal letters to **JANE STONE #5** under her door.

399.   **JANE STONE #5** would stand talking to **CO SMALLS** for several hours at a time at the "Bubble," which is the enclosed area from which correction officers would view inmates.

400.   **CO SMALLS** used these conversations and letters to groom **JANE STONE #5** for illegal sexual activity.

401.   **CO DEOSARRAN** saw **JANE STONE #5** standing by the Bubble for a long period of time.

402.   **CO DEOSARRAN** told **JANE STONE #5** that she was spending too much time at the Bubble talking to **CO SMALLS**.

403.   **CO DEOSARRAN** told **JANE STONE #5** to "watch what [she was] doing."

404.   Upon information and belief, several unknown correction officers warned **CO SMALLS** to be careful when interacting with **JANE STONE #5** because the relationship was becoming too personal.

405.   These unknown officers knew that **CO SMALLS** was grooming **JANE STONE #5** for sexual activity but failed to report it or otherwise intervene to protect **JANE STONE #5**.

406.   During the evening count, **CO SMALLS** would let **JANE STONE #5** out of her cell so that she could bring buckets of hot water to the inmates being held in "Keeplock."

407.   Keeplock is a disciplinary status at BHCF where an inmate is locked in her cell for 23 hours a day with one hour for recreation. It differs from SHU because the inmate is confined in her own cell instead of a solitary unit.

408.   Other officers would allow other porters to bring the water to the Keeplock inmates, but **CO SMALLS** would always choose **JANE STONE #5** so that he could spend time with her after she had finished delivering the water.

46

409.    Each night after the evening count, the number of inmates would need to be verified among all the units. The officer in charge of each unit would call in his count number to the Watch Commander on duty. Once all counts were submitted to the Watch Commander, regular inmate movement would resume. This process typically took about thirty minutes. Most inmates remained locked in their cells during the count verification process.

410.    Starting in the winter of 2014, **CO SMALLS** used the time while there was no movement in the unit during the count verification process to sexually exploit **JANE STONE #5**.

411.    One night, during the count verification, **CO SMALLS** ordered **JANE STONE #5** to go from her cell to the utility closet behind the Bubble.

412.    The utility closet was widely known to staff and inmates as an area that was outside of the visual range of cameras and therefore was unmonitored.

413.    **CO SMALLS** then entered the closet and kissed **JANE STONE #5**.

414.    **CO SMALLS** was not afraid of being caught by a supervisor because correction officers routinely and predictably radioed each other to warn the unit officers when a supervisor was coming.

415.    A few nights later, during the count, **CO SMALLS** again directed **JANE STONE #5** to meet him in the utility closet behind the Bubble.

416.    Once **CO SMALLS** and **JANE STONE #5** were inside the utility closet, **CO SMALLS** put on a condom that he had brought through security into the facility.

417.    **CO SMALLS** then inserted his penis into **JANE STONE #5**'s vagina.

47

418.    On another night a few days later, **CO SMALLS** and **JANE STONE #5** again met in the utility closet where he put his penis in her mouth and then in her vagina.

419.    On two occasions in early 2015, **CO SMALLS** brought water bottles filled with vodka into the facility and gave them to **JANE STONE #5** to drink.

420.    The relationship between **CO SMALLS** and **JANE STONE #5** was so open and notorious that other inmates would ask **JANE STONE #5** to request favors from **CO SMALLS** on their behalf.

421.    For example, another inmate asked **JANE STONE #5** to get **CO SMALLS** to transfer her girlfriend, another inmate, into the unit.

422.    About a month after **CO SMALLS** had sexual intercourse with **JANE STONE #5** for the first time, **CO PAIGE** told **JANE STONE #5** that her relationship with **CO SMALLS** was obvious and that all of the correction officers were talking about it.

423.    Upon information and belief, **CO PAIGE** did not report the relationship to any supervisors, including the PREA officer or any commanding officer.

424.    **CO GUZMAN** was a friend of **CO SMALLS**.

425.    A short time after **CO PAIGE** confronted **JANE STONE #5**, **CO GUZMAN** told **JANE STONE #5** that **JANE STONE #5** was going to get **CO SMALLS** in trouble.

426.    At the same time, **CO GUZMAN** was involved in a sexual relationship with another inmate, "Jane Sand #2," who worked on the paint crew and yard crew

48

with **JANE STONE #5**. Though Jane Sand #2 never told **JANE STONE #5** any specifics about the relationship, she did confirm that a relationship existed.

427.    In December 2014, **CO GUZMAN** told **JANE STONE #5** that he was under investigation because of his relationship with Jane Sand #2 and other unnamed inmates.

428.    At no time did **CO PAIGE** or **CO GUZMAN** advise **JANE STONE #5** to file a PREA complaint.

429.    At no time did **CO PAIGE** or **CO GUZMAN** report the suspected relationship between **JANE STONE #5** and **CO SMALLS** to the PREA officer or any other supervisor or commanding officer.

430.    **CO GUZMAN** and **CO PAIGE** failed to report **CO SMALLS**'s sexual contact with **JANE STONE #5** even though they knew it was ongoing.

431.    In December 2014, **CO GUZMAN** was arrested and charged with third-degree rape stemming from his relationship with the other inmate.

432.    Eventually, **JANE STONE #5** was transferred to Albion CF.

433.    While at Albion CF, **JANE STONE #5** came to realize that **CO SMALLS** had manipulated and used her for his own sexual gratification.

434.    **CO SMALLS** surprised **JANE STONE #5** by visiting her at Albion CF.

435.    **JANE STONE #5** was afraid that DOCCS would find out about her relationship with **CO SMALLS** and punish her.

436.    One day, while **JANE STONE #5** was on her way to work, two investigators approached **JANE STONE #5**.

437.   In front of other inmates, the investigators pushed **JANE STONE #5** against a wall and forcefully handcuffed her.

438.   The investigators refused to tell **JANE STONE #5** why they had cuffed her.

439.   The investigators searched **JANE STONE #5** and brought her to Admin.

440.   **JANE STONE #5** was then interviewed by two OSI investigators.

441.   Initially, **JANE STONE #5** denied any relationship with **CO SMALLS**.

442.   Two OSI investigators told **JANE STONE #5** that they already had evidence and that other officers were currently searching her cell with a blacklight.

443.   The two OSI investigators told **JANE STONE #5** that there was no point in lying to them about it and that she would get in trouble if she did not tell them "the truth."

444.   **JANE STONE #5** believed that her conditional release date could be delayed if she did not cooperate with the investigation.

445.   Afraid, **JANE STONE #5** eventually wrote a statement about her relationship with **CO SMALLS**.

446.   When **JANE STONE #5** returned to her cell, the other inmates began asking her why DOCCS staff had been searching her cell with a blacklight.

447.   The same two OSI investigators interviewed **JANE STONE #5** at least once more.

448.   The same two OSI investigators told **JANE STONE #5** that her statement would remain private.

449.    Sometime later, in winter 2015, **JANE STONE #5** was again abruptly and publicly ordered to leave work and to pack up for court.

450.    **JANE STONE #5** did not have court scheduled and no one told her why she was being brought to court.

451.    **JANE STONE #5** was taken to Taconic, where she was told by DOCCS staff that she had to testify in the grand jury proceedings against **CO SMALLS**.

452.    As soon as **JANE STONE #5** arrived at Taconic, inmates and correction officers began making derogatory comments to her about her relationship with **CO SMALLS**.

453.    Shortly after arriving at Taconic, **JANE STONE #5** went out for recreation in the yard. She was standing by the phones when two male correction officers approached her. The two officers cornered **JANE STONE #5** against the phones and called her a "snitch." They told her that they "knew what [she] was at Taconic to do" and that she just wanted to "bring down a fellow officer" for something that she "wanted all along."

454.    At this time, there were no cameras in the recreation yard at Taconic.

455.    **JANE STONE #5** knew that there were no cameras.

456.    **JANE STONE #5** had been told by other inmates that corrections staff at Taconic routinely retaliated against inmates by physically abusing them.

457.    Terrified, **JANE STONE #5** immediately left the recreation yard and reported the incident.

458.   **JANE STONE #5** asked to be transferred back to Albion CF as soon as possible.

459.   **JANE STONE #5** was so afraid of continued retaliation by correction officers at Taconic that she avoided leaving her cell and never returned to the yard before she was returned to Albion CF.

460.   In the summer of 2016, after her release, **JANE STONE #5** received a subpoena compelling her to testify against **CO SMALLS** at his criminal trial.

461.   **JANE STONE #5** testified for a day and then was recalled several days later.

462.   On July 1, 2016, **CO SMALLS** was found guilty by a jury of criminal sexual act in the third degree and official misconduct.

463.   **CO SMALLS** was sentenced to one to three years' imprisonment and had to register as a sex offender as a result of his sexual misconduct.

464.   **JANE STONE #5** is currently serving a term of supervised release until March 29, 2021.

465.   At any time, **JANE STONE #5**'s release status could be revoked, and she could be returned to DOCCS custody.

466.   **JANE STONE #5** fears that if she were returned to DOCCS custody, she would face retaliation at the hands of correction officers.

III.   **COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK, AND SUPT MITCHELL-VOYD BY THEIR ACTIONS AND FAILURE TO ACT CREATED AN ENVIRONMENT IN DOCCS FACILITIES WHERE SEXUAL ABUSE BY STAFF WAS FREQUENT AND PREDATORY BEHAVIOR BY CORRECTION OFFICERS WAS NOT DETERRED.**

467.   As detailed in the following paragraphs, **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** were all (1) responsible for preventing sexual abuse by guards against inmates, including the Plaintiffs; (2) on notice of the serious risk of sexual abuse by male guards faced by Plaintiffs and other women incarcerated at Albion CF, BHCF, Lakeview, and Taconic; and (3) failed to enact and enforce policies that would have prevented the officers from sexually assaulting Plaintiffs.

>    A.   **COMMR ANNUCCI and COMMR EFFMAN were responsible for preventing sexual abuse of all DOCCS inmates; SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK, AND SUPT MITCHELL-VOYD  were responsible for preventing sexual abuse in their respective facilities.**

468.   **COMMR ANNUCCI** was at all relevant times responsible for enacting policies and procedures to protect the safety of inmates incarcerated in DOCCS and ensuring that the policies and practices are enforced in DOCCS facilities.

469.   The United States Department of Justice ("DOJ") regulation at 28 C.F.R. § 115.11(b) requires an agency to employ or designate an upper-level, agency-wide PREA coordinator with sufficient time and authority to develop, implement, and oversee agency efforts to comply with PREA standards in all its facilities. **COMMR EFFMAN** was at all relevant times the individual charged with these responsibilities for DOCCS.

470.   **SUPT SQUIRES** was at all relevant times responsible for the safety of the inmates at Albion CF. **SUPT SQUIRES** was at all relevant times responsible for creating and enforcing policies and practices that ensure the safety of the inmates at Albion CF.

471.   **SUPT KAPLAN** was at all relevant times responsible for the safety of the inmates at BHCF. **SUPT KAPLAN** was at all relevant times responsible for creating and enforcing policies and practices that ensure the safety of the inmates at BHCF.

472.   **SUPT KUBIK** was at all relevant times responsible for the safety of the inmates at Lakeview. **SUPT KUBIK** was at all relevant times responsible for creating and enforcing policies and practices that ensure the safety of the inmates at Lakeview.

473.   **SUPT MITCHELL-VOID** was at all relevant times responsible for the safety of the inmates at Taconic. **SUPT MITCHELL-VOID** was at all relevant times responsible for creating and enforcing policies and practices that ensure the safety of the inmates at Taconic.

474.   The superintendents were physically at their facilities.

475.   The superintendents had operational control over their staff at their facilities.

476.   **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** failed to implement policies or procedures to protect inmates from sexual abuse at their facilities.

477.    Despite repeated instances of officer sexual abuse of inmates at DOCCS facilities, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** failed to enact or enforce policies to correct the pervasive custom of abuse at Albion CF, Taconic, Lakeview and BHCF.

> **B.  COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK, and SUPT MITCHELL-VOYD were aware of the substantial risks of sexual abuse face by female prisoners in DOCCS facilities.**

478.    **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** were aware that the risk and numerous incidents of sexual abuse of female inmates at the hands of male prison guards led the federal government, the District of Columbia, and all fifty states to enact statutes criminalizing *any* sexual contact between prisoners and corrections staff.

479.    **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** were aware that in New York the risk and numerous incidents of sexual abuse of female prisoners at the hands of male guards led to the criminalization of *any* sexual contact between prisoners and correctional staff in the enactment of N.Y. Penal Law § 130.05(3)(e), which states that an inmate committed to the care and custody of DOCCS is incapable of giving consent to sexual activity.

480.    **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** were aware that the risk of custodial sexual abuse led to the enactment of PREA in 2003.

481.   Upon information and belief, **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** were aware of the general findings of a 2018 report by the DOJ's Bureau of Justice Statistics that since the implementation of the National Standards to Prevent, Detect, and Respond to Prison Rape in 2012, allegations of staff-on-inmate sexual misconduct in Corrections Departments nationwide increased 191%, and substantiated incidents of staff-on-inmate sexual misconduct increased 48.5%.

482.   **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** knew that custodial sexual abuse continued to be a pervasive problem in DOCCS facilities between 2014 and 2019.

483.   DOCCS reported in its December 2018 "Annual Report on Sexual Victimization 2013-2016" (the "2018 DOCCS Report") that OSI received 277 complaints of staff sexual abuse and harassment in 2013. It also received 394 such complaints in 2014, 446 such complaints in 2015, and 341 such complaints in 2016.

484.   **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** knew that although female inmates made up less than five percent of the entire inmate population, they disproportionally made up a larger share of complaints for sexual victimization.

485.   The 2018 Report shows that complaints from inmates at female-only facilities made up more than 17% percent of the total reports in 2014, more than 13% in 2015 and more than 18% in 2016.

486.   **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** also knew that the average rate of substantiated allegations per 1,000 inmates was more than 10 times higher at female-only facilities than male-only facilities for 2014, 2015, and 2016.

487.   Based on their experience working in correctional facilities, **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** knew that the actual number of sexual assaults and rapes in their facilities must have been much higher than the reported number.

488.   For a number of reasons and from a variety of sources, **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** were aware that assigning male staff to guard female prisoners creates obvious risks of sexual abuse.

489.   Upon information and belief, **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** were aware that the risk and incidents of sexual abuse in a prison setting led to the promulgation of international standards prohibiting the assignment of male corrections staff to guard women prisoners. United Nations Standard Minimum Rules for the Treatment of Prisoners, Rule 53, adopted Aug. 30, 1955.

490.   Upon information and belief, **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** were aware that the risk and incidents of sexual abuse in a prison setting, including the particular risks facing women prisoners, led several states and local correctional

institutions to require the presence of female staff to guard women prisoners, and even to remove men from guarding women prisoners, at least in housing areas.

491.    Upon information and belief, **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** were aware that women prisoners were a particularly vulnerable population who faced a heightened risk of sexual abuse by male officers. A larger number of incarcerated women have histories of sexual and physical abuse than male prisoners or women who have never been incarcerated. One study conducted in 1999 found that 70% of incarcerated females in the New York State Maximum security facilities had been previously physically abused, and 60% had been previously sexually abused.

492.    Upon information and belief, **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** were aware that these abuse histories make women especially vulnerable to coercion and manipulation. A 2013 report by the DOJ Bureau of Justice Statistics concluded that inmates who experienced sexual victimization before coming to the facility were more likely than inmates with no sexual victimization history to report incidents of sexual victimization involving other inmates and staff.

493.    The DOJ's Bureau of Justice Statistics periodically releases reports of anonymous surveys on sexual victimization in prisons and jails. The last time that women prisoners in New York were included in the survey, New York State prisoners self-reported the highest rates of staff sexual abuse in the nation.

494.   **COMMR ANNUCCI** and **COMMR EFFMAN** have been party to a number of injunctive and damages cases brought in both state and federal courts by women prisoners who have been victims of staff sexual abuse. The cases include the putative class action litigation *Amador v. Andrews*, Case No. 03 Civ. 0650 (S.D.N.Y.), which was brought on behalf of 17 named plaintiffs in 2003, and *Jones v. Annucci*, Case No. 16 Civ. 1473 (S.D.N.Y.), which was brought on behalf of seven named plaintiffs in 2016.

495.   Numerous instances of staff sexual misconduct at DOCCS facilities by officers have resulted in criminal charges in the past six years. **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** were aware of at least the following instances that resulted in criminal actions against DOCCS staff:

   a.   In June of 2014, John M. Randolph, a correction officer at Albion CF was arrested and charged with third-degree rape of an inmate.

   b.   In July of 2014, Kevin R. Fields, a correction officer at BHCF, was arrested and charged with third-degree rape of an inmate.

   c.   In October of 2014, Richard Rodriguez, a correction officer at BHCF, pled guilty to third-degree rape.

   d.   In December of 2014, Jose Guzman, a correction officer at BHCF, was arrested and charged with the rape of an inmate.

   e.   In August of 2015, Ruben Garcia, a correction officer at BHCF, was arrested and charged with the rape of two inmates and later plead guilty.

f.  On May 4, 2016, Daniel Oliver, a correction officer at Taconic was arrested and charged with official misconduct related to an unlawful relationship with two inmates.

g.  In October of 2016, Christopher Claud, a correction officer at Albion CF was arrested and charged with forcible touching.

h.  In November of 2017, Daijon Talford, a correction officer at Albion CF was arrested and charged with official misconduct related to an unlawful relationship with an inmate.

i.  In July of 2017, Ruben Illa, a correction officer at BHCF, was arrested and charged with filing a false report related to an improper relationship with an inmate.

j.  On August 15, 2017, Jeffrey Green, a correction officer at BHCF, was sentencing to nine months in prison for sexually assaulting an inmate.

k.  On May 4, 2018, Ira Colon, a correction officer at Taconic, was charged with raping an inmate.

l.  Also, on May 4, 2018, Garth Trail, a cook at Taconic, was charged with a criminal sexual act with an inmate.

496.   Upon information and belief, **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** knew that cases that result in criminal prosecutions or the discipline of staff do not reflect the entire universe of staff misconduct, given that only reported incidents of sexual misconduct, harassment, and abuse are investigated, and **COMMR ANNUCCI**,

60

**COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** knew that staff sexual abuse is significantly underreported.

497.   Victims of sexual abuse, generally, are unlikely to come forward with complaints of sexual misconduct due to embarrassment and humiliation and a fear that such complaints will be greeted with skepticism or disbelief.

498.   These concerns are exacerbated in a correctional setting, where the persons to whom such complaints are to be made are colleagues of the perpetrators of the abuse, putting the victim at risk of retaliation; where complaints of such abuse are not maintained in a confidential fashion; and where there is a well-founded belief by women prisoners that such complaints will be greeted with skepticism and will not result in any action against the perpetrator.

499.   The failure of **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** to implement and enforce policies and practices that would actually prevent and punish all sexual abuse contributes to a lenient and permissive prison culture and increases the risk of sexual abuse of women prisoners.

500.   Some of the abuse that took place in DOCCS facilities was deemed by staff to be "consensual." In other words, the inmates were not necessarily subjected to physically forcible abuse, but rather appeared to enter into sexual contact voluntarily. However, any purportedly "consensual" sexual activity between corrections staff and the prisoners they are paid to guard and control is a fallacy, regardless of the "willingness" of the prisoner. Consent in such circumstances is non-

existent under the law, as nearly every state legislature in the United States has recognized. Purportedly "consensual" sexual activity between inmates and officers does not resemble actual "consent" as it might exist outside of the prison context.

    **C. COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KUBIK, SUPT MITCHELL-VOYD and SUPT KAPLAN failed to enact supervisory policies that would prevent sexual abuse by male staff and failed to enforce existing policies.**

501.   Despite known risks and frequent incidents of sexual misconduct by staff, **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD**, through their policies and practices (or lack thereof) recklessly disregarded these risks and failed to protect the women prisoners in their custody from harm. **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** inadequately supervised corrections staff, placing women prisoners at a heightened risk of sexual abuse.

502.   **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** failed to enact appropriate rules and policies concerning the behavior of male staff and failed to enforce existing rules and policies governing staff behavior.

    i.    **COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK, and SUPT MITCHELL-VOYD permitted male correction officers to be alone with female inmates for long periods of time, which created an unjustifiable and unreasonable risk of harm to plaintiffs and predictably led to sexual abuse.**

503.   Despite knowledge of the risk of sexual abuse in women's prisons, **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT**

KUBIK, and **SUPT MITCHELL-VOYD** permitted the assignment of male staff, including **CO BEAM**, **CO CASTONGUAY**, **CO MIDDLEBROOKS**, **CO NORDE**, **CO SMITH**, **CO SMALLS**, and **CO STUPNICK** to posts on which they had ample opportunity for unmonitored contact with female inmates, including Plaintiffs.

504.   **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** supervised male staff guarding female inmates no differently from the way they would supervise same-gender supervision of men.

505.   Male staff, including **CO BEAM**, **CO CASTONGUAY**, **CO MIDDLEBROOKS**, **CO NORDE**, **CO SMITH**, **CO SMALLS**, and **CO STUPNICK**, were assigned, alone, to areas where no other staff are within range for visual contact. This includes assignments that cover remote or isolated areas not monitored by video surveillance and even overnight shifts in housing areas.

506.   Allowing male staff long periods of unsupervised contact not only allows ample time for sexual abuse of female inmates, but also fosters an environment where male staff can develop personal relationships with female inmates to groom and coerce them into sexual acts over time.

507.   Upon information and belief, **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** knew many incidents of sexual abuse that occurred at DOCCS facilities, including the ones leading to the arrest and prosecution of staff members above, arose out of

instances where a single male staff member is assigned to guard female inmates for prolonged periods.

508.   **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** knew that changing DOCCS policy, or that of their individual facility, to prohibit a single male staff member from watching female inmates for prolonged periods would immensely reduce the risk of staff-on-inmate sexual abuse, but they chose not to implement that policy, formally or in practice.

509.   **SUPT SQUIRES** allowed **CO STUPNICK** to frequently be the only officer assigned to **JANE STONE #2**'s dorm area, which gave **CO STUPNICK** the freedom to cultivate an inappropriate relationship with **JANE STONE #2** and eventually repeatedly sexually abuse her.

510.   Following the discovery of **JANE STONE #2**'s rape at Albion CF, **SUPT SQUIRES** also permitted **CO CASTONGUAY** to be the sole staff member assigned to **JANE STONE #6**'s dormitory area each night that **CO CASTONGUAY** raped **JANE STONE #6** in the laundry room of the unit. **CO CASTONGUAY** used the same overnight shift and laundry room to rape **JANE STONE #1**.

511.   **SUPT SQUIRES** also permitted **CO SMITH** and **CO MIDDLEBROOKS** to supervise **JANE STONE #6** for prolonged periods of time in her unit, giving them the opportunity to rape her multiple times.

512.   **SUPT MITCHELL-VOYD** allowed **CO NORDE** to often be assigned alone with **JANE STONE #3**, first in the caustics department then in the 81 basement,

which gave **CO NORDE** the opportunity to manipulate and coerce **JANE STONE #3** over time and eventually rape her repeatedly.

513.    **SUPT KUBIK** let **CO BEAM** work as the only correction officer for **JANE STONE #4** and Jane Sand, which allowed him to sexually abuse **JANE STONE #4**.

514.    **SUPT KAPLAN** permitted **CO SMALLS** to be the sole correction officer guarding female inmates, including **JANE STONE #5**, which allowed **CO SMALLS** to coerce, manipulate, and eventually rape **JANE STONE #5**.

515.    The rapes of **JANE STONE #1**, **JANE STONE #2**, **JANE STONE #3**, **JANE STONE #4**, **JANE STONE #5**, **JANE STONE #6**, and many others would not have occurred if **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** had implemented a policy to prohibit a single male officer from guarding female inmates for prolonged periods of time.

> ii.    **COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK, and SUPT MITCHELL-VOYD failed to enact or implement policies for staff to carry out unannounced and random supervisory rounds, which created an unjustifiable and unreasonable risk of harm to Plaintiffs and predictably led to sexual abuse.**

516.    **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** not only permitted a single male correction officer to be alone with female inmates for long periods of time but failed to enact and enforce adequate rules and policies to ensure that unannounced, random supervisory rounds were conducted, which would have mitigated the high risk of sex abuse.

517.    Supervisory rounds consist of a supervisor checking in on various posts throughout the facility to oversee correction officers and ensure there is no problem. Random and unannounced supervisory rounds would deter correction officers from forming inappropriate relationships with female inmates or sexually abusing them.

518.    Although DOCCS ostensibly promulgates rules and regulations requiring random and unannounced supervisory rounds, in practice, at BHCF, Albion CF, Lakeview, and Taconic, supervisory rounds are not random, unannounced, or carried out in any useful way.

519.    Upon information and belief, supervisory rounds at these facilities consisted of merely stopping by the assigned line officers' desk or office, signing the logbook and nothing more.

520.    Upon information and belief, there was no requirement that supervisory staff must see each officer on duty, check in verbally with each officer, ask the officers any particular questions, speak with the prisoners on a housing unit or program assignment or ask them if they have problems, or that they observe the entire area, including the prisoners and the staff, for any misconduct, or make any notations on what they observe.

521.    Upon information and belief, **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD**, failed to require a set number and frequency of supervisory rounds by most supervisory officers. Only rounds by the Superintendents and their executive teams were required at a specific frequency, and that is only once a week, with no other

66

written policies and procedures directing the frequency and regularity of rounds. In practice, sergeants typically visit each post once or twice per shift.

522.   **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** failed to require unpredictable supervisory rounds. Facility supervisors routinely conducted rounds in a predictable manner, failing to vary their time, frequency, and point of entry, leaving staff able to predict periods of time, such as the time around shift change or after a supervisor has passed through, when they can virtually be assured that they can engage in misconduct with women prisoners without being discovered.

523.   **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** knew that in many previous sexual abuse cases of female DOCCS inmates, the lack of proper supervisory rounds had facilitated the sexual abuse.

524.   At Albion CF, staff members routinely radio ahead to let other staff members know when supervisory rounds are coming. **CO STUPNICK**, **CO CASTONGUAY**, and **CO SMITH** were informed by fellow staff members whenever a supervisory round would be coming to their post.

525.   **SUPT SQUIRES** failed to create or enforce policies that led to supervisory rounds being conducted without notification to officers.

526.   For years, **CO STUPNICK** acted with impunity while grooming, coercing, manipulating, abusing, and raping **JANE STONE #2**, knowing that he would never

be caught in the act, since he would be notified when other staff members were approaching.

527.   Following **CO STUPNICK**'s arrest, no changes were made to the practice of announcing supervisory rounds to other officers. Upon information and belief, no officers were disciplined for calling ahead to **CO STUPNICK** to announce rounds.

528.   A short time later, with the same system remaining in place, **CO CASTONGUAY** similarly acted without fear of being caught in the act because he knew he would be told if supervisory rounds were coming. **CO CASTONGUAY** raped **JANE STONE #6** and **JANE STONE #1** multiple times without fear that another officer would come in during the abuse because it was custom at Albion CF to call ahead.

529.   At the same time, while the practice was still in place, **CO SMITH** was able to sexually assault **JANE STONE #6** multiple times in her unit, and even order her to have sex with another inmate in front of him because this warning system prevented him from getting caught.

530.   Similarly, **CO MIDDLEBROOKS** was able to sexually abuse **JANE STONE #6** multiple times in her unit and in the employee break room because he was always warned before supervisory rounds occurred.

531.   At Lakeview, it was also common for officers to call ahead to give advance notice of supervisory rounds, which would happen once per shift. This practice allowed **CO BEAM** to sexually assault **JANE STONE #4** without fear of being caught in the act.

532.   At Taconic, supervisory rounds were conducted infrequently in the caustics department and 81 basement. When supervisory rounds were performed, **CO NORDE** was called ahead of time to alert him that supervisory rounds were being conducted. Supervisors conducting rounds would simply sign the logbook and not interact with or observe staff or inmates.

533.   On one occasion when **CO NORDE** was alone with **JANE STONE #3** in caustics, **CO NORDE** received a call that the PREA coordinator was conducting rounds. **CO NORDE** sent **JANE STONE #3** back to her unit before the PREA coordinator arrived.

534.   At BHCF, correction officers routinely and predictably radioed each other to warn the unit officers that a supervisor was coming. **CO SMALLS** was not worried that a supervisor would catch him with **JANE STONE #5** in the utility closet because of the custom to call ahead and warn officers that a supervisor was coming.

> iii.   **COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK, and SUPT MITCHELL-VOYD failed to install or cause the monitoring of existing cameras to prevent sexual abuse and grooming of inmates for sexual abuse.**

535.   To the extent **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** installed or required installation of surveillance cameras, use of those cameras for supervision was, at all relevant times, grossly inadequate to protect women prisoners.

536.   Upon information and belief, surveillance cameras were not installed throughout Albion CF, Taconic, Lakeview, and BHCF. Many enclosed and isolated areas inside the prison or isolated areas outside the prison, where sexual abuse is

more likely to occur, or has been reported to have occurred, are completely outside of any video or audio surveillance. These areas included storage closets, laundry rooms, slop sink areas, sheds, outside work areas, and basements.

537.   Where video cameras did exist, they were not adequately monitored, if at all. Upon information and belief, no staff member at Albion CF, BHCF, Lakeview or Taconic was assigned to view the cameras in real time, or soon thereafter.

538.   Upon information and belief, video camera footage was reviewed only after an incident had been reported to see if corroboration existed.

539.   Video camera footage was not monitored to detect or deter the formation of improper relationships by officers with inmates.

540.   At Albion CF, cameras were either not set up or were not monitored to prevent the numerous long personal conversations held between **CO STUPNICK** and **JANE STONE #2**, which led to the rape and sexual abuse.

541.   Also at Albion CF, cameras were either not set up or were not monitored to prevent **CO CASTONGUAY** from entering the inmate shower room or into the laundry room to rape **JANE STONE #1** and **JANE STONE #6**.

542.   **CO CASTONGUAY** took **JANE STONE #1** and **JANE STONE #6** into the laundry room to rape them there because it was widely known within the facility to be an area that was not monitored by cameras.

543.   Another area with known blind spots at Albion CF was the employee break room, where **CO MIDDLEBROOKS** repeatedly made sexual advances on **JANE STONE #6**.

70

544.   **COMMR ANNUCCI**, **COMMR EFFMAN**, and **SUPT SQUIRES** knew that, in 2015, a correction officer had raped a female inmate in a laundry room because it was known that laundry rooms were not equipped with surveillance cameras. *See Crandell v. Ross*, 17-cv-0755 (BKS/CFH) (W.D.N.Y.), ECF No. 23 at ¶¶ 18. They took no steps to install cameras in laundry rooms at Albion CF.

545.   At Lakeview, cameras were not placed or monitored around or inside the Bubble to prevent **CO BEAM** from bringing **JANE STONE #4** into the Bubble and raping her. Cameras were also not placed or monitored to observe **CO BEAM** speaking to **JANE STONE #4** one-on-one for lengthy periods of time.

546.   At Taconic, cameras were not installed in the caustics department. Upon information and belief, cameras could have been installed to capture the caustics department.

547.   Also, at Taconic, while a camera was installed in the 81 basement, it was completely unmonitored. This allowed **CO NORDE** to bring **JANE STONE #3** into the staff bathroom to rape her multiple times without fear of being caught.

548.   At BHCF, cameras were either not set up to capture **CO SMALLS** and **JANE STONE #5** repeatedly entering the utility closet together, or not monitored. This lack of camera placement or monitoring allowed **CO SMALLS** to repeatedly rape **JANE STONE #5** inside this room without fear of being seen and stopped.

iv. **COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK, and SUPT MITCHELL-VOYD allowed correction officers to choose ("bid for") their own assignments, which created an unjustifiable and unreasonable risk of harm to Plaintiffs and predictably led to sexual abuse.**

549. **COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK**, and **SUPT MITCHELL-VOYD** permitted correction officers to change "bids" through any agreement amongst the officers themselves, without regard to the number or severity of allegations of sexual misconduct that had been made by women prisoners about them, which contributed to the enormous risk of sexual abuse.

550. Officers only had to agree amongst themselves when to swap shifts or assignments.

551. Upon information and belief, there was no policy created or enforced to monitor the number of "bids" officers swapped with one another or to track if an officer frequently swapped for the same bid at a given time.

552. At Albion CF, **CO CASTONGUAY**, **CO MIDDLEBROOKS**, and **CO STUPNICK** swapped their bids multiple times to work in the units of **JANE STONE #2**, **JANE STONE #1**, and **JANE STONE #6** or to work the overnight shifts, when they knew it would be easier to rape the women.

553. At Taconic, after **JANE STONE #3**'s work assignment was transferred to caustics department and then the 81 basement, **CO NORDE** was permitted to swap his bid to work there despite the fact that he was changing his bid just weeks after the inmate he supervised one-on-one transferred to a new assignment, and that he was requesting to be in a one-on-one assignment with her again. This created the

72

environment where **CO NORDE** was alone with **JANE STONE #3** and could bring her into the staff bathroom where he raped her.

554.    At Lakeview, **CO BEAM** swapped bids to be assigned to **JANE STONE #4**'s dorm. **CO BEAM**'s assignment to that dorm allowed him to frequently be the sole officer assigned to **JANE STONE #4**, allowing him access to prey upon her.

> v.    **COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK, and SUPT MITCHELL-VOYD created a culture and custom at DOCCS facilities where warning signs of sexual abuse were ignored and inappropriate staff-inmate relationships were permitted.**

555.    **COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK,** and **SUPT MITCHELL-VOYD** failed to enact adequate rules and policies to monitor and discipline staff engaged in behavior that constituted warning signs of sexual abuse, such as spending a disproportionate amount of time talking to a particular prisoner, repeatedly requesting a particular prisoner for a particular assignment, discussing personal life with a prisoner, or asking a prisoner a personal question. Staff were not disciplined or informally counselled when supervisors witnessed behavior that was indicative of warning signs of sexual abuse.

556.    **COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK,** and **SUPT MITCHELL-VOYD** additionally created a culture and custom of ignoring staff-inmate relationships by failing to investigate or discipline officers who knew of improper relationships between correction officers and inmates.

557.    Despite publicly promulgating policies against such relationships and behavior, the utter lack of enforcement of these policies made clear to DOCCS staff

that they were under no real duty to report warning signs of abuse or inappropriate staff-inmate relationships.

558. Upon information and belief, supervision did not include observation and counseling or discipline for officers engaged in behavior evincing warning signs of sexual abuse, including engaging in personal conversations with inmates, sharing personal items with inmates, or repeatedly requesting a particular inmate for special assignments in secluded locations.

559. It was widely known to DOCCS correction officers and staff that they would not get in trouble for failing to report inappropriate staff-inmate relationships. A culture of silence on the issue was encouraged.

560. In the criminal cases listed above in ¶ 495 and the many other unprosecuted cases in that period, other officers at the facilities knew about ongoing relationships between the inmate-victim and staff-abuser and did not report them.

561. Upon information and belief, not a single staff member has been disciplined, punished, or terminated from employment based solely on a failure to report an inappropriate relationship.

562. Similarly, **CO SMALLS**'s relationship with **JANE STONE #5** was widely known throughout the facility by correction officers and inmates. No DOCCS staff were disciplined, reprimanded, or terminated for knowing about and failing to report the relationship.

563. At Albion CF, **CO CASTONGUAY**, **CO MIDDLEBROOKS**, and **CO SMITH** frequently shifted their bids to work the overnight shifts, when they knew it

would be easier to sexually assault **JANE STONE #6** and **JANE STONE #1** without being caught.

564.   Also at Albion CF, **CO STUPNICK** publicly groomed **JANE STONE #2** for months and had long conversations with her at the officer's desk. No correction officers ever reported the relationship, and it was eventually reported by a fellow inmate.

565.   At Lakeview, upon information and belief, several DOCCS staff members knew that **CO BEAM** spent inordinate amounts of time having personal conversations with **JANE STONE #4** over a period of months. **CO VASQUEZ** overheard a particularly personal and inappropriate conversation.

566.   None of the staff at Lakeview acted to protect **JANE STONE #4** from **CO BEAM** because they knew that DOCCS staff are expected to cover up for each other and not "rat" on fellow staff.

567.   Staff at Lakeview, including **CO VASQUEZ**, believed their silence and failure to protect **JANE STONE #4** would have no negative impact on their career.

568.   **CO BEAM** frequently entered Lakeview intoxicated or high on drugs.

569.   The culture of silence at Lakeview prevented any DOCCS staff from reporting **CO BEAM** for reporting to duty in this condition.

570.   No staff took action to prevent **CO BEAM** from coming to work intoxicated or high on drugs.

571.   **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** have failed to take sufficient

action when officers leave their assigned posts, allow inmates into areas where inmates are not permitted, ask women to volunteer or work jobs to which they have not been formally assigned, and engage in open and obvious behavior that is suggestive of inappropriate relationships.

572.   At Taconic, staff members learned of **CO NORDE**'s ongoing improper relationship with **JANE STONE #3** and did not report it because it was the culture and custom to not report such conduct.

573.   Upon information and belief, DOCCS staff at Taconic also knew about an inappropriate personal relationship between **CO NORDE** and another inmate prior to the last instance of abuse of **JANE STONE #3**. No DOCCS staff member reported the inappropriate relationship with the other inmate.

574.   **CO BEAM** frequently left his assigned work area to spend time with **JANE STONE #4** in her dorm. Upon information and belief, DOCCS staff knew that **CO BEAM** was leaving his assigned work area for the purpose of spending time with **JANE STONE #4**.

575.   **CO BEAM** was never reported, disciplined, or reprimanded since his conduct was permissible under the custom and policies of Lakeview.

> vi.   **COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK, and SUPT MITCHELL-VOYD failed to create or enforce policies to remove correction officers who had developed inappropriate relationships with female inmates from having contact with those inmates.**

576.   **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** failed to enact or enforce

polices to remove correction officers from female inmates in situations where it was discovered that an inappropriate relationship was formed.

577.   Even in cases where an inappropriate relationship was discovered by investigators, DOCCS often allowed staff to continue to work closely with the same inmates with whom they had developed an inappropriate relationship.

578.   Staff who were the subject of credible or repeated allegations of sexual abuse were allowed to continue their usual posts and permitted to access private, unmonitored areas. They were even permitted to continue to guard or to have contact or proximity with the prisoner who had complained about the officer.

579.   DOCCS's repeated failure to remove officers from inmates they were alleged to have abused emboldened other staff members to conduct similar behavior, and discouraged other staff from making complaints about misbehavior. Allowing these officers to remain in their posts with the same privileges, at times monitoring their alleged victims, conveyed to DOCCS staff that any written policies to the contrary would not be enforced unless overwhelming corroboration existed.

       vii.   **COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK, and SUPT MITCHELL-VOYD created a culture of intimidation and fear at DOCCS facilities where inmates lacked confidentiality in reporting incidents of sexual abuse, feared retaliation, and did not think they would be believed.**

580.   **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD** created a culture of intimidation when they failed to provide inmates with a confidential way of reporting incidents of sexual abuse.

77

581.   Inmates were aware that reporting what had happened to them could result in retaliation by DOCCS staff and other inmates at their facility, compounding the abuse they had already suffered as a result of policies more likely to perpetuate sexual abuse than prevent it.

582.   A survey of inmates related to a 2018 PREA audit of BHCF found that most inmates did not believe that a complaint of sexual abuse would remain confidential.

583.   Sexual abuse complaints at DOCCS facilities were not treated as confidential.

584.   Correction officers frequently exchanged and spread information about sexual abuse of inmates.

585.   No policy was enforced to deter correction officers from spreading supposedly confidential information.

586.   Inmates knew that their complaints would not be kept confidential, and that they would be risking retaliation.

587.   Inmates also knew that they were likely to be disbelieved or discredited if they reported sexual abuse by staff.

588.   **COMMR ANNUCCI**, **COMMR EFFMAN**, **SUPT SQUIRES**, **SUPT KAPLAN**, **SUPT KUBIK**, and **SUPT MITCHELL-VOYD**, by failing to enact or enforce sufficient policies, created a culture in which female inmates' initial complaints were discouraged and disbelieved.

589.    Inmates were made more vulnerable to coercion and manipulation by a correction officer since they knew that a complaint about inappropriate behavior would be discouraged and disbelieved.

590.    At Albion CF, **JANE STONE #1** immediately attempted to report that she was raped, but no one on the hotline answered until after 8:00 a.m. Once DOCCS staff became aware of the rape, they initially tried to question **JANE STONE #1** about it publicly. **JANE STONE #1**, who was unable to trust DOCCS staff at Albion CF, refused to turn over the corroborating physical evidence she had until OSI arrived.

591.    **JANE STONE #1** believed that if she gave the physical evidence to DOCCS staff that it would be "lost" or "destroyed." After reporting the incident, **JANE STONE #1** was not transferred to an outside hospital for a rape kit until after 2:00 p.m., and when she returned, all of the inmates in her unit knew about the rape. DOCCS staff also approached **JANE STONE #1** and called her a "liar."

592.    **JANE STONE #6** overheard corrections staff calling **JANE STONE #1** a liar and was told by several inmates that **JANE STONE #1** had been sent to SHU for filing her PREA complaint. Afraid that she would also be called a liar and sent to solitary confinement, **JANE STONE #6** did not report the multiple assaults **CO CASTONGUAY**, **CO MIDDLEBROOKS**, and **CO SMITH** perpetrated against her.

593.    Concerned that DOCCS would lose the physical evidence of her assault, **JANE STONE #6** gave the t-shirt containing **CO CASTONGUAY**'s ejaculate to a friend outside of the DOCCS system.

594.    At Taconic, the same culture prevented **JANE STONE #3** from filing a PREA complaint earlier. **JANE STONE #3** feared that her complaint would not be anonymous, and that she would lose privileges, possibly even the right to make phone calls to her children.

595.    **JANE STONE #3** had witnessed other inmates lose privileges for asserting their own rights against officers, where officers lied and covered up for other officers.

596.    At Taconic, inmates in **JANE STONE #3**'s unit made complaints against a correction officer who was instructing inmates to wear their hair up. The correction officer claimed that inmates' wearing their hair down risked sexually arousing the correction officers, which could cause them to act inappropriately. The inmates made the complaint to **SUPT MITCHELL-VOYD** assuming their confidentiality would be protected. Instead, the names of the complaining inmates were given to the officer who was the subject of the complaint, and he retaliated against the complaining inmates.

597.    This and other experiences made clear to **JANE STONE #3** that complaints would not be kept confidential, and that it was, in fact, the custom and policy to blame female inmates in cases where correction officers became sexually aroused and acted inappropriately. As a result, **JANE STONE #3** was afraid to report her abuse because she knew that she would be blamed, and that her complaint would not be kept confidential.

viii.   **COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK, and SUPT MITCHELL-VOYD failed to implement policies to prohibit DOCCS staff from entering DOCCS facilities with contraband that aided their coercion and abuse of female inmates.**

598.   **COMMR ANNUCCI, COMMR EFFMAN, SUPT SQUIRES, SUPT KAPLAN, SUPT KUBIK,** and **SUPT MITCHELL-VOYD** failed to require and conduct reasonable searches of corrections staff upon entry to correctional facilities that could help prevent or discourage sexual abuse or ultimately assist in the investigation of allegations of staff sexual misconduct. The failure to catch corrections staff with contraband such as drugs and alcohol, or to limit entry of condoms, cell phones, notes, and other personal items allows officers the opportunity to use these items to influence, coerce, or otherwise manipulate prisoners into performing sexual acts and limits the evidence that could be used in investigations of staff sexual misconduct.

599.   For example, at Lakeview, **CO BEAM** was permitted to bring contraband shampoo and lotions into the facility for Jane Sand and **JANE STONE #4**. **CO BEAM** used these items in his coercive plot to sexual abuse **JANE STONE #4**.

600.   **SUPT SQUIRES** had not established or enforced a policy of searching incoming staff members to detect, confiscate, and intercept contraband.

601.   For example, at Albion CF, **CO MIDDLEBROOKS** frequently snuck in alcohol and distributed it to **JANE STONE #6** and her friends.

602.   Also at Albion CF, **CO STUPNICK** gave **JANE STONE #2** a necklace from Kay Jewelers.

<u>**FIRST CAUSE OF ACTION**</u>

## CRUEL AND UNUSUAL PUNISHMENT
## VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (BY JANE STONE #1 Against CO CASTONGUAY)

603.    Paragraphs 1–602 are hereby incorporated and realleged.

604.    By forcibly putting his genitals in **JANE STONE #1**'s mouth before ordering her to the laundry room and forcefully raping her vaginally and anally, **CO CASTONGUAY** acted willfully and wantonly for his own sexual gratification.

605.    There was no penological justification for **CO CASTONGUAY**'s conduct.

606.    **CO CASTONGUAY**'s conduct was unreasonable and in violation of **JANE STONE #1**'s clearly established constitutional right to be free from cruel and unusual punishment.

607.    **CO CASTONGUAY**'s conduct constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

608.    **JANE STONE #1** suffered physical, emotional, and psychological pain and other damages as a result of the constitutional violation.


### SECOND CAUSE OF ACTION
### RAPE IN THE FIRST DEGREE
### VIOLATION OF N.Y. PENAL LAW § 130.35
### (By JANE STONE #1 Against CO CASTONGUAY)

609.    Paragraphs 1–608 are hereby incorporated and realleged.

610.    On May 12, 2019, **CO CASTONGUAY** orally, vaginally, and anally raped **JANE STONE #1** by forcible compulsion.

611.    There was no penological justification for **CO CASTONGUAY**'s conduct.

612.    **JANE STONE #1** could not and did not consent to this conduct.

613.   Such touching violated N.Y. Penal Law § 130.35.

614.   **JANE STONE #1** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## THIRD CAUSE OF ACTION
### SEXUAL ABUSE IN THE FIRST DEGREE
### VIOLATION OF N.Y. PENAL LAW § 130.55
### (By JANE STONE #1 Against CO CASTONGUAY)

615.   Paragraphs 1–614 are hereby incorporated and realleged.

616.   On May 12, 2019 **CO CASTONGUAY** subjected **JANE STONE #1** to sexual assault by entering her cube and forcefully putting his penis in her mouth.

617.   **CO CASTONGUAY** ordered **JANE STONE #1** to the laundry room and orally, vaginally, and anally penetrated her for the purpose of gratifying his own sexual desire.

618.   **CO CASTONGUAY** touched **JANE STONE #1**'s genitals through the use of physical force.

619.   Such touching violated N.Y. Penal Law § 130.55.

620.   **JANE STONE #1** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## FOURTH CAUSE OF ACTION
### NEW YORK COMMON LAW BATTERY
### (By JANE STONE #1 Against CO CASTONGUAY)

621.   Paragraphs 1–620 are hereby incorporated and realleged.

622.   The May 12, 2019 sexual assault by **CO CASTONGUAY** on **JANE STONE #1** constituted a battery upon **JANE STONE #1** in that the above-described bodily contact was intentional, unauthorized, and grossly offensive in nature.

623.   **JANE STONE #1** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

### FIFTH CAUSE OF ACTION
### CRUEL AND UNUSUAL PUNISHMENT
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By JANE STONE #6 Against CO CASTONGUAY)

624.   Paragraphs 1–623 are hereby incorporated and realleged.

625.   By repeatedly ordering that **JANE STONE #6** put his genitals in her mouth before vaginally raping her, **CO CASTONGUAY** acted willfully and wantonly for his own sexual gratification.

626.   There was no penological justification for **CO CASTONGUAY**'s conduct.

627.   **CO CASTONGUAY**'s conduct was unreasonable and in violation of **JANE STONE #6**'s clearly established constitutional right to be free from cruel and unusual punishment.

628.   **CO CASTONGUAY**'s conduct constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

629.   **JANE STONE #6** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

### SIXTH CAUSE OF ACTION
### RAPE IN THE FIRST DEGREE
### VIOLATION OF N.Y. PENAL LAW § 130.35
### (By JANE STONE #6 Against CO CASTONGUAY)

630.    Paragraphs 1–629 are hereby incorporated and realleged.

631.    On April 4, April 5, and April 25, 2019, **CO CASTONGUAY** orally and vaginally raped **JANE STONE #6** by forcible compulsion.

632.    **JANE STONE #6** could not and did not consent to such action.

633.    There was no penological justification for **CO CASTONGUAY**'s conduct.

634.    Such touching violated N.Y. Penal Law § 130.35.

635.    **JANE STONE #6** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## SEVENTH CAUSE OF ACTION
### SEXUAL ABUSE IN THE FIRST DEGREE
### VIOLATION OF N.Y. PENAL LAW § 130.55
### (By JANE STONE #1 Against CO CASTONGUAY)

636.    Paragraphs 1–635 are hereby incorporated and realleged.

637.    On April 4, April 5, and April 25, 2019, **CO CASTONGUAY** ordered **JANE STONE #6** to have oral and vaginal intercourse.

638.    On April 9, 2019, **CO CASTONGUAY** sexually assaulted **JANE STONE #6** by forcibly putting his penis in her mouth.

639.    **CO CASTONGUAY** ordered **JANE STONE #6** to engage in these sexual acts for the purpose of gratifying his own sexual desire.

640.    Such touching violated N.Y. Penal Law § 130.55.

641.    **JANE STONE #6** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## EIGHTH CAUSE OF ACTION

### NEW YORK COMMON LAW BATTERY
### (By JANE STONE #6 Against CO CASTONGUAY)

642.    Paragraphs 1–641 are hereby incorporated and realleged.

643.    The repeated sexual assaults by **CO CASTONGUY** on **JANE STONE #6** constituted a battery upon **JANE STONE #6** in that the above-described bodily contact was intentional, unauthorized, and grossly offensive in nature.

644.    **JANE STONE #6** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## NINTH CAUSE OF ACTION

### CRUEL AND UNUSUAL PUNISHMENT
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By JANE STONE #6 Against CO MIDDLEBROOKS)

645.    Paragraphs 1–644 are hereby incorporated and realleged.

646.    By following **JANE STONE #6** into the shower and repeatedly ordering her to touch his genitals over clothing, as well as entering her cube multiple times to touch and suck on her breasts, **CO MIDDLEBROOKS** acted willfully and wantonly for his own sexual gratification.

647.    There was no penological justification for **CO MIDDLEBROOKS**'s conduct.

648.    **CO MIDDLEBROOKS**'s conduct was unreasonable and in violation of **JANE STONE #6**'s clearly established constitutional right to be free from cruel and unusual punishment.

649.    **CO MIDDLEBROOKS**'s conduct constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

650.    **JANE STONE #6** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## TENTH CAUSE OF ACTION

### SEXUAL ABUSE IN THE FIRST DEGREE
### VIOLATION OF N.Y. PENAL LAW § 130.55
### (By JANE STONE #6 Against CO MIDDLEBROOKS)

651.    Paragraphs 1–650 are hereby incorporated and realleged.

652.   From February 2019 until September 2019, **CO MIDDLEBROOKS** sexually assaulted **JANE STONE #6** on numerous occasions by repeatedly and forcibly grabbing **JANE STONE #6**'s breasts with his hands and sucking on them.

653.   Such touching violated N.Y. Penal Law § 130.55.

654.   **JANE STONE #6** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## ELEVENTH CAUSE OF ACTION
### NEW YORK COMMON LAW BATTERY
### (By JANE STONE #6 Against CO MIDDLEBROOKS)

655.   Paragraphs 1–654 are hereby incorporated and realleged.

656.   The repeated sexual assaults by **CO MIDDLEBROOKS** on **JANE STONE #6** constituted a battery upon **JANE STONE #6** in that the above-described bodily contact was intentional, unauthorized, and grossly offensive in nature.

657.   **JANE STONE #6** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## TWELFTH CAUSE OF ACTION
### CRUEL AND UNUSUAL PUNISHMENT
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By JANE STONE #6 Against CO SMITH)

658.   Paragraphs 1–657 are hereby incorporated and realleged.

659.   By ordering **JANE STONE #6** to have sex with another female inmate in front of him, and by touching **JANE STONE #6**'s buttocks, **CO SMITH** acted willfully and wantonly for his own sexual gratification.

660.   There was no penological justification for **CO SMITH**'s conduct.

661. **CO SMITH**s conduct was unreasonable and in violation of **JANE STONE #6**'s clearly established constitutional right to be free from cruel and unusual punishment.

662. **CO SMITH**'s conduct constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

663. **JANE STONE #6** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## THIRTEENTH CAUSE OF ACTION
### SEXUAL ABUSE IN THE SECOND DEGREE VIOLATION OF N.Y. PENAL LAW § 130.60
### (By JANE STONE #6 Against CO SMITH)

664. Paragraphs 1–663 are hereby incorporated and realleged.

665. **CO SMITH**'s conduct described above subjected **JANE STONE #6** to sexual contact when **JANE STONE #6** was incapable of consent.

666. Such touching violated N.Y. Penal Law §§ 130.40 and 130.55.

667. **JANE STONE #6** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## FOURTEENTH CAUSE OF ACTION
### NEW YORK COMMON LAW BATTERY
### (By JANE STONE #6 Against CO SMITH)

668. Paragraphs 1–667 are hereby incorporated and realleged.

669. The repeated contact caused by **CO SMITH** on **JANE STONE #6** constituted a battery upon **JANE STONE #6** in that the above-described bodily contact was intentional, unauthorized, and grossly offensive in nature.

670.   **JANE STONE #6** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## FIFTEENTH CAUSE OF ACTION
### CRUEL AND UNUSUAL PUNISHMENT
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By JANE STONE #2 Against CO STUPNICK)

671.   Paragraphs 1–670 are hereby incorporated and realleged.

672.   By repeatedly kissing, fondling, and digitally penetrating **JANE STONE #2**'s genitals, and by putting his genitals in **JANE STONE #2**'s mouth, **CO STUPNICK** acted willfully and wantonly for his own sexual gratification.

673.   There was no penological justification for **CO STUPNICK**'s conduct.

674.   **CO STUPNICK**'s conduct was unreasonable and in violation of **JANE STONE #2**'s clearly established constitutional right to be free from cruel and unusual punishment.

675.   **CO STUPNICK**'s conduct constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

676.   **JANE STONE #2** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## SIXTEENTH CAUSE OF ACTION
### RAPE IN THE THIRD DEGREE
### VIOLATION OF N.Y. PENAL LAW § 130.25
### (By JANE STONE #2 Against CO STUPNICK)

677.   Paragraphs 1–676 are hereby incorporated and realleged.

678.   From December 2017 to February 2019, **CO STUPNICK** repeatedly raped **JANE STONE #2** by kissing her, digitally and orally penetrating her genitals, and having her perform oral sex on him when she was incapable of consent.

679.   **CO STUPNICK** rubbed and penetrated **JANE STONE #2**'s genitals and put his genitals in **JANE STONE #2**'s mouth for the purpose of gratifying his own sexual desire.

680.   Such touching violated N.Y. Penal Law §§ 130.25, 130.40 and 130.55.

681.   **JANE STONE #2** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## SEVENTEENTH CAUSE OF ACTION
### SEXUAL ABUSE IN THE SECOND DEGREE
### VIOLATION OF N.Y. PENAL LAW § 130.60
### (By JANE STONE #2 Against CO STUPNICK)

682.   Paragraphs 1–681 are hereby incorporated and realleged.

683.   From December 2017 to February 2019, **CO STUPNICK** repeatedly raped **JANE STONE #2** by kissing her, digitally and orally penetrating her genitals, and by having her perform oral sex on him when she was incapable of consent.

684.   **CO STUPNICK** rubbed and penetrated **JANE STONE #2**'s genitals and put his genitals in **JANE STONE #2**'s mouth for the purpose of gratifying his own sexual desire.

685.   Such touching violated N.Y. Penal Law §§ 130.40 and 130.60.

686.   **JANE STONE #2** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## EIGHTEENTH CAUSE OF ACTION
### NEW YORK COMMON LAW BATTERY
### (By JANE STONE #2 Against CO STUPNICK)

687.     Paragraphs 1–686 are hereby incorporated and realleged.

688.     The numerous sexual assaults by **CO STUPNICK** of **JANE STONE #2**
constituted a battery upon **JANE STONE #2** in that the above-described bodily
contact was intentional, unauthorized, and grossly offensive in nature.

689.     **JANE STONE #2** suffered physical, emotional, and psychological pain
and other damages as a result of this violation.

## NINTEENTH CAUSE OF ACTION
### DELIBERATE INDIFFERENCE
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By JANE STONE #2 Against INV HANZLIAN and INV CASTRO)

690.     Paragraphs 1–689 are hereby incorporated and realleged.

691.     **INV HANZLIAN** and **INV CASTRO** were both personally aware of the
imminent risk to **JANE STONE #2** posed by **CO STUPNICK**.

692.     **INV HANZLIAN** and **INV CASTRO** failed to take any steps to protect
**JANE STONE #2** from **CO STUPNICK**.

693.     As a result of **INV HANZLIAN** and **INV CASTRO**'s failure to act, **CO
STUPNICK** subjected **JANE STONE #2** to illegal sexual activity on numerous
occasions after **INV HANZLIAN** and **INV CASTRO** learned of the risk to **JANE
STONE #2** that **CO STUPNICK** posed.

694.     **JANE STONE #2** suffered physical, emotional, and psychological pain
and other damages as a result of this violation.

## TWENTIETH CAUSE OF ACTION
### CRUEL AND UNUSUAL PUNISHMENT
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By JANE STONE #3 Against CO NORDE)

695.    Paragraphs 1–694 are hereby incorporated and realleged.

696.    In orally and vaginally raping **JANE STONE #3** numerous times and infecting her with herpes, **CO NORDE** acted willfully and wantonly for his own sexual gratification.

697.    There was no penological justification for **CO NORDE**'s conduct.

698.    **CO NORDE**'s conduct was unreasonable and in violation of **JANE STONE #3**'s clearly established constitutional right to be free from cruel and unusual punishment.

699.    **CO NORDE**'s conduct constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

700.    **JANE STONE #3** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## TWENTY-FIRST CAUSE OF ACTION
### FAILURE TO PROTECT
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By JANE STONE #3 Against CO LOVELACE and CO LOPEZ)

701.    Paragraphs 1–700 are hereby incorporated and realleged.

702.    In the summer of 2018, **CO LOPEZ** became aware of the relationship between **CO NORDE** and **JANE STONE #3** after hearing that **CO NORDE** gave **JANE STONE #3** a razor.

703.   **CO LOPEZ** said to **JANE STONE #3** that she was not going to report the relationship, but that **JANE STONE #3** should "keep her mouth shut."

704.   Similarly, in the fall of 2018, **CO LOVELACE** became aware of the inappropriate relationship between **CO NORDE** and **JANE STONE #3** when she noticed that **JANE STONE #3** took longer than necessary to return from running an errand and discovered that **CO NORDE** was working the unit **JANE STONE #3** had just returned from.

705.   **CO LOVELACE** told **JANE STONE #3**, "Now I know why you wanted to go to caustics."

706.   Neither **CO LOPEZ** or **CO LOVELACE** ever reported their suspicions to a PREA officer or to any supervising officer.

707.   **CO LOPEZ** and **CO LOVELACE** made no attempts to interfere in the relationship.

708.   **CO LOPEZ** and **CO LOVELACE** failed to protect **JANE STONE #3** from the imminent risk of sexual abuse by **CO NORDE**.

709.   **JANE STONE #3** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

### TWENTY-SECOND CAUSE OF ACTION
#### CRUEL AND UNUSUAL PUNISHMENT
#### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
#### (By JANE STONE #4 Against CO BEAM)

710.   Paragraphs 1–709 are hereby incorporated and realleged.

711.    In ordering **JANE STONE #4** to have sex with him and having sex with her in July 2017, **CO BEAM** acted willfully and wantonly for his own sexual gratification.

712.    There was no penological justification for **CO BEAM**'s conduct.

713.    **CO BEAM**'s conduct was unreasonable and in violation of **JANE STONE #4**'s clearly established constitutional right to be free from cruel and unusual punishment.

714.    **CO BEAM**'s conduct constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

715.    **JANE STONE #4** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

<u>**TWENTY-THIRD CAUSE OF ACTION**</u>
**FAILURE TO PROTECT**
**VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII**
**(By JANE STONE #4 Against CO ANTOLINI and CO VASQUEZ)**

716.    Paragraphs 1–715 are hereby incorporated and realleged.

717.    As early as July 2017, **CO ANTOLINI** was aware of the inappropriate relationship between **JANE STONE #4** and **CO BEAM**.

718.    **CO VASQUEZ** knew about the improper relationship between **CO BEAM** and **JANE STONE #4** and did not report it or otherwise try to protect her.

719.    **CO ANTOLINI** and **CO VASQUEZ** were aware that **CO BEAM** had frequent access to Plaintiff and supervisory control over her due to his position as a

correction officer and community meeting leader. **CO ANTOLINI** failed to protect

**JANE STONE #4** from the imminent risk of sexual abuse by **CO BEAM**.

720.    **JANE STONE #4** suffered physical, emotional, and psychological pain

and other damages as a result of this violation.

## TWENTY-FOURTH CAUSE OF ACTION
### CRUEL AND UNUSUAL PUNISHMENT
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By JANE STONE #5 Against CO SMALLS)

721.    Paragraphs 1–720 are hereby incorporated and realleged.

722.    By orally and vaginally raping **JANE STONE #5** multiple times, **CO SMALLS** acted willfully and wantonly for his own sexual gratification.

723.    There was no penological justification for **CO SMALLS**'s conduct.

724.    **CO SMALLS**'s conduct was unreasonable and in violation of **JANE STONE #5**'s clearly established constitutional right to be free from cruel and unusual punishment.

725.    **CO SMALLS**'s conduct constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

726.    **JANE STONE #5** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## TWENTY-FIFTH CAUSE OF ACTION
### FAILURE TO PROTECT
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By JANE STONE #5 Against CO DEOSARRAN, CO GUZMAN, and CO PAIGE)

727.    Paragraphs 1–726 are hereby incorporated and realleged.

728.    **CO DEOSARRAN** knew about the improper relationship between **JANE STONE #5** and **CO SMALLS** and told **JANE STONE #5** to be careful.

729.    **CO GUZMAN** was **CO SMALLS**'s friend and was aware of the relationship between **CO SMALLS** and **JANE STONE #5**. **CO GUZMAN** told **JANE**

**STONE #5** that she was going to get **CO SMALLS** in trouble if the relationship continued.

730.     Similarly, **CO PAIGE** told **JANE STONE #5** that the relationship with **CO SMALLS** was obvious and that all of the correction officers were discussing it.

731.     Neither **CO DEOSARRAN**, **CO GUZMAN**, nor **CO PAIGE** ever reported their suspicions to PREA or to any supervising officers.

732.     **CO DEOSARRAN**, **CO GUZMAN**, and **CO PAIGE** made no attempts to interfere in the relationship.

733.     **CO DEOSARRAN**, **CO GUZMAN**, and **CO PAIGE** failed to protect **JANE STONE #5** from the imminent risk of sexual abuse by **CO SMALLS**.

734.     **JANE STONE #5** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## TWENTY-SIXTH CAUSE OF ACTION
### DELIBERATE INDIFFERENCE
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By JANE STONE #1, JANE STONE #2, and
### JANE STONE #6 Against SUPT SQUIRES)

735.     Paragraphs 1–734 are hereby incorporated and realleged.

736.     **SUPT SQUIRES** was aware that male correction officers at DOCCS facilities, including at Albion CF, were repeatedly accused, charged, and criminally convicted of sexually abusing female inmates.

737.     **SUPT SQUIRES** was directly and personally responsible for the safety of inmates at Albion CF.

738.  **SUPT SQUIRES** failed to implement and enforce policies sufficient to protect female inmates at Albion CF from sexual abuse by male correction officers.

739.  **SUPT SQUIRES** created a custom and unspoken policy, through her actions and failures to act, in which Albion CF staff did not report and turned a blind eye to warning signs of improper relationships and manipulation of inmates by correction officers.

740.  **SUPT SQUIRES** was deliberately indifferent to a serious risk to the safety of all female inmates at the hands of male correction officers at Albion CF.

741.  Prior to the sexual abuses and rapes of **JANE STONE #1**, **JANE STONE #2**, and **JANE STONE #6** in Albion CF laundry rooms, **SUPT SQUIRES** knew that laundry rooms at Albion CF posed a specific risk to the female inmates at Albion CF because they were unmonitored areas where sexual abuse could occur, and, in fact, had occurred previously.

742.  **SUPT SQUIRES** took no action to monitor laundry rooms at Albion CF or ensure the safety of female inmates inside the laundry rooms. As a direct result of this indifference and failure to act, sexual predators working as correction officers at Albion CF, including **STUPNICK**, **CASTONGUAY**, and **MIDDLEBROOKS**, knew that they could go undetected while sexually abusing female inmates in laundry rooms at Albion CF.

743.  The deliberate indifference of **SUPT SQUIRES** led to the sexual abuses of **JANE STONE #1**, **JANE STONE #2**, and **JANE STONE #6**.

744.   **JANE STONE #1**, **JANE STONE #2**, and **JANE STONE #6** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## TWENTY-SEVENTH CAUSE OF ACTION

### DELIBERATE INDIFFERENCE
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By JANE STONE #5 Against SUPT KAPLAN)

745. Paragraphs 1–744 are hereby incorporated and realleged.

746. **SUPT KAPLAN** was aware that male correction officers at DOCCS facilities, including at BHCF, were repeatedly accused, charged, and criminally convicted of sexually abusing female inmates.

747. **SUPT KAPLAN** was directly and personally responsible for the safety of inmates at BHCF.

748. **SUPT KAPLAN** failed to implement and enforce policies sufficient to protect female inmates at BHCF from sexual abuse by male correction officers.

749. **SUPT KAPLAN** created a custom and unspoken policy, through her actions and failures to act, in which BHCF staff did not report and turned a blind eye to warning signs of improper relationships and manipulation of inmates by correction officers.

750. **SUPT KAPLAN** was deliberately indifferent to a serious risk to the safety of all female inmates at the hands of male correction officers at BHCF.

751. The deliberate indifference of **SUPT KAPLAN** led to the sexual abuse of **JANE STONE #5**.

752. **JANE STONE #5** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## TWENTY-EIGHTH CAUSE OF ACTION

### DELIBERATE INDIFFERENCE
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By JANE STONE #4 Against SUPT KUBIC)

753.    Paragraphs 1–752 are hereby incorporated and realleged.

754.    **SUPT KUBIK** was aware that male correction officers at DOCCS facilities were repeatedly accused, charged, and criminally convicted of sexually abusing female inmates.

755.    **SUPT KUBIK** was directly and personally responsible for the safety of inmates at Lakeview.

756.    **SUPT KUBIK** failed to implement and enforce policies sufficient to protect female inmates at Lakeview from sexual abuse by male correction officers.

757.    **SUPT KUBIK** created a custom and unspoken policy, through his actions and failures to act, in which Lakeview staff did not report and turned a blind eye to warning signs of improper relationships and manipulation of inmates by correction officers.

758.    **SUPT KUBIK** was deliberately indifferent to a serious risk to the safety of all female inmates at the hands of male correction officers at Lakeview.

759.    The deliberate indifference of **SUPT KUBIK** led to the sexual abuse of **JANE STONE #4**.

760.    **JANE STONE #4** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## TWENTY-NINTH CAUSE OF ACTION

### DELIBERATE INDIFFERENCE
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By JANE STONE #3 Against SUPT MITCHELL-VOYD)

761.   Paragraphs 1–760 are hereby incorporated and realleged.

762.   **SUPT MITCHELL-VOYD** was aware that male correction officers at DOCCS facilities, including at Taconic, were repeatedly accused, charged, and criminally convicted of sexually abusing female inmates.

763.   **SUPT MITCHELL-VOYD** was directly and personally responsible for the safety of inmates at Taconic.

764.   **SUPT MITCHELL-VOYD** failed to implement and enforce policies sufficient to protect female inmates at Taconic from sexual abuse by male correction officers.

765.   **SUPT MITCHELL-VOYD** created a custom and unspoken policy, through her actions and failures to act, in which Taconic staff did not report and turned a blind eye to warning signs of improper relationships and manipulation of inmates by correction officers.

766.   **SUPT MITCHELL-VOYD** was deliberately indifferent to a serious risk to the safety of all female inmates at the hands of male correction officers at Taconic.

767.   The deliberate indifference of **SUPT MITCHELL-VOYD** led to the sexual abuse of **JANE STONE #3**.

768.   **JANE STONE #3** suffered physical, emotional, and psychological pain and other damages as a result of this violation.

## THIRTIETH CAUSE OF ACTION
### DELIBERATE INDIFFERENCE
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By All Plaintiffs Against COMMR ANNUCCI, and COMMR EFFMAN)

769. Paragraphs 1–768 are hereby incorporated and realleged.

770. **COMMR ANNUCCI** and **COMMR EFFMAN** were aware that male correction officers at Albion CF, BHCF, Lakeview, and Taconic were repeatedly accused, charged, and criminally convicted of sexually abusing female inmates.

771. **COMMR ANNUCCI** and **COMMR EFFMAN** were directly and personally responsible for the safety of inmates at Albion CF, BHCF, Lakeview, and Taconic.

772. **COMMR ANNUCCI** and **COMMR EFFMAN** failed to implement and enforce policies sufficient to protect female inmates at Albion CF, BHCF, Lakeview, and Taconic from sexual abuse by male correction officers.

773. **COMMR ANNUCCI** and **COMMR EFFMAN** created a custom and unspoken policy, through their actions and failures to act, in which DOCCS staff did not report and turned a blind eye to warning signs of improper relationships and manipulation of inmates by correction officers.

774. **COMMR ANNUCCI** and **COMMR EFFMAN** were deliberately indifferent to a serious risk to the safety of all female inmates at the hands of male correction officers at Albion CF, BHCF, Lakeview, and Taconic.

775. The deliberate indifference of **COMMR ANNUCCI** and **COMMR EFFMAN** led to the sexual assaults of each of the Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and demand judgment in their favor on each of their claims against defendants as follows:

a.      That a jury find, and the Court adjudge and decree, that Plaintiffs shall recover compensatory damages in the sum of $25,000,000, plus punitive damages in the sum of $25,000,000 against the defendants, plus nominal damages in the sum of $1 against the defendants, jointly and severally, together with interest.

b.      That Plaintiffs recover the costs of the suit herein, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

c.      That Plaintiffs be awarded such other and further relief as the Court shall deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues and counts in the Complaint herein.

Dated:      New York, New York
            September 25, 2020

                              Respectfully submitted,


                        By: _____
                              Daniel A. McGuinness

                              LAW OFFICES OF DANIEL A.
                              MCGUINNESS, PC
                              260 Madison Avenue, 17th Floor
                              New York, NY 10016
                              Tel: (212) 679-1990
                              Fax: (888) 697-0585
                              Email: dan@legalmcg.com


                                   - and -


                        By: _____/s/_____
                              Zachary Margulis-Ohnuma
                              Victoria Nicole Medley

                              LAW OFFICE OF ZACHARY
                              MARGULIS-OHNUMA
                              260 Madison Avenue, 17th Floor
                              New York, NY 10016
                              Tel: (212) 685-0999
                              Fax: (212) 685-0922
                              Email: zach@zmolaw.com